By the Court.
 

 The questions before the court are whether the remedy of mandamus is available to the relator and, if so, when and under what circumstances may an elector be given assistance in marking his ballot.
 

 The functions of the respondent, as Secretary of State, relating to the conduct of elections are prescribed by Sections 4785-6 and 4785-7, General Code.
 

 Section 4785-6, General Code, reads as follows:
 

 “The Secretary of State, by virtue of his office, shall be the chief election officer of the state, with such powers and duties relating to the registration of voters and the conduct of elections as are prescribed in this act. He shall perform these duties, in addition to other du
 
 *225
 
 ties imposed upon him by law, without additional compensation. ’ ’
 

 The pertinent part of Section 4785-7, General Code, reads as follows:
 

 “It shall be the duty of the Secretary of State to appoint, in the manner provided by law, all members of boards of elections, to advise with members of such boards as to the proper methods of conducting elections; to prepare rules, regulations and instructions for the conduct of elections; * * * to determine and prescribe, in the manner provided by law, the forms of ballots, the forms of all blanks, cards of instructions, poll books, tally sheets, certificates of election * * *; to compel the observance, by election officers in the several counties, of the requirements of the election laws * * *.”
 

 Under these statutes it is the duty of the respondent to advise with and direct members of the boards of elections “as to the proper methods of conducting elections” and “to compel the observance, by election officers in the several counties, of the requirements of the election laws.” These duties are ministerial and clearly required by law.
 

 The relator alleges that the respondent in attempting to carry out his official duties under these statutes advised the members of the boards of elections to aid illiterate voters in marking their ballots. If such advice is an erroneous interpretation of the election laws there must be some remedy to correct the error and to require proper instructions in lieu of those erroneously given.
 

 In 25 Ohio Jurisprudence, 993, Section 21, it is said:
 

 “It is generally recognized that where the performance of a ministerial duty is enjoined by law upon a public officer or inferior judicial tribunal, the court, upon an application for a mandamus, will judicially determine the legal rights of the applicant, and will, of
 
 *226
 
 necessity, decide whether the duty exists. The question of law involved in this determination must necessarily intervene in every case where the interposition of judicial authority is required. The fact that the determination by the officer, as to what constitutes his duty, calls for the construction of the statute imposing the duty, does not prevent such duty from being enforceable by mandamus. A doubt that may arise in the mind of the court in matter of law, as to the existarice of the duty, will not, as some of the cases seem to hold, require or justify the denial of the writ. It is the court’s duty to solve all such doubts, and to declare the duty as it finds it to be, after its misgivings as to the intent and meaning of the statute involved, or as to any other question of law, have been eliminated. Substantial doubt as to whether the facts of the particular case present the conditions upon which the officer is bound to act may, it would seem, justify or require the refusal of the writ. Of course, the doubts of the officer, no matter how strong or honest, as to his duty, are of no consequence, inasmuch as the right to a writ of mandamus to compel the performance of an official act by a public officer depends upon his legal duty, and not upon his doubts. And where there is an act of an officer requiring the construction of a statute, concerning which there may be an honest difference of opinion, mandamus is the proper remedy to compel such officer to act in accordance with the required construction, or to show cause why he does not.” See, also,
 
 State, ex rel. Manix,
 
 v.
 
 Aud.,
 
 43 Ohio St., 311;
 
 State, ex rel. Atty. Genl.,
 
 v.
 
 Hoglan,
 
 64 Ohio St., 532, 60 N. E., 627.
 

 In the opinion of this court if the respondent has, under the law, misdirected the members of the boards of elections as to their duties, the matter may be corrected through the remedy of mandamus.
 

 The substantive questions before the court involve
 
 *227
 
 the interpretation and the constitutionality of Section 4785-132, General Code, which reads as follows:
 

 “Any elector who declares to the presiding judge of elections that he is unable to mark his ballot
 
 by reason of physical
 
 infirmity, and such physical infirmity
 
 is apparent to the judges to be sufficient to incapacitate the voter from marking his ballot properly,
 
 may upon request be aided by a near relative who shall be admitted to the booth with such elector, or may receive the assistance
 
 in the marking thereof
 
 of the two judges of elections belonging to different political parties, and they shall thereafter give no information in regard to this matter. The presiding judge may require such declaration of inability to be made by the elector under oath before him.
 
 Such assistance shall not be rendered, for any other cause. ’ ’
 
 (Italics supplied.)
 

 By the clear language of this statute, aid in marking a ballot may be given only to such electors as are unable to mark their ballots by reason of physical infirmity and only when such physical infirmity is apparent to the judges to be sufficient to so incapacitate the voter. Aid to all other voters is clearly denied.
 

 This interpretation is fortified by the legislative history of this statutory provision.
 

 The first, statute on this subject, Section 2966-37, Revised Statutes, was adopted by the General Assembly in 1891 (88 Ohio Laws, 461) and read, in part, as follows :
 

 “
 
 Any elector
 
 who declares to the presiding judge of election,
 
 that for any reason
 
 he is unable to mark his ballot, shall, upon request, receive the assistance of two of the judges of election, belonging to different political parties, in the marking thereof, and they shall thereafter give no information in regard to the matter. The presiding judge may, in his discretion, require such declaration of disability to be made by the elector under oath before him.” (Italics supplied.)
 

 
 *228
 
 Under this statute assistance might have been given to any voter for any reason solely upon the request of the voter. In 1897 this statute was amended (92 Ohio Laws, 148) to read as follows:
 

 “Any elector who declares to the presiding judge of election that he is unable to mark his ballot
 
 by reason of blindness, paralysis, extreme old age or other physical infirmity,
 
 and such physical infirmity is apparent to the judges to be sufficient to incapacitate the voter from marking his ballot properly, may, upon request, receive the assistance in the marking thereof of two of the judges of election, belonging to different political parties, and they shall thereafter give no information in regard to the matter.
 
 But such assistance shall not be rendered for any other cause which the voter may specify
 
 * * *.” (Italics supplied.)
 

 In 1929 (113 Ohio Laws, 369) this section was again amended to its present form. It will be observed that the language of the statute is now such as to exclude assistance to voters except to those who by physical infirmity are unable to mark their ballots. In effect, the Attorney General, as counsel for the respondent, now concedes this interpretation of the language of the statute. In referring- to Section 4785-132, General Code, in his brief in this case, he says:
 

 “The section provides clearly for rendering assistance at the polls to voters suffering from physical infirmities and would appear to deny such assistance to any other voter.
 

 í Í * * =K=
 

 “The Attorney General does
 
 not
 
 maintain that Section 4785-132, General Code, which prescribes the procedure for assisting voters suffering from physical infirmities,- applies to illiterate voters. The Attorney General does
 
 not
 
 request this court to read anything into said section, nor to interpret it as applying to illiterate voters.”
 

 
 *229
 
 The Attorney General states his position in his brief as follows:
 

 “ (1) If Section 4785-132, General Code,
 
 is construed
 
 to prohibit assistance to illiterate voters, to that extent it is unconstitutional; and (2) said section prescribes a reasonable procedure for assisting voters unable to mark their ballots for the candidates of their choice, which procedure the Secretary of State may adopt to be followed in instances not specifically covered by statutory law.”
 

 The right of a citizen to exercise the right of suffrage is guaranteed by Section 1, Article Y of the Ohio Constitution, in the following words:
 

 “Every citizen of the United States, of the age of twenty-one years, who shall have been a resident of the state one year next preceding the election, and of the county, township, or ward, in which he resides, such time as may be provided by law, shall have the qualifications of an elector, and be entitled to vote at all elections.”
 

 Section 6, Article V of the Constitution, disqualifies idiots and insane persons from voting. All other citizens having proper qualifications may vote. The right of citizens to vote may not be denied or abridged, and, clearly, all qualified citizens have a right to vote even though they may suffer physical infirmities, illiteracy, feebleness of mind, ignorance or lack of information. But the ability to mark and cast a ballot rests upon the individual voter. If a statute should require each voter to mark and prepare his ballot in secret without declaring its content to other persons, doubtless such regulation would be valid and would not constitute a deprivation of the right to vote. On this subject, this court, in the case of
 
 State, ex rel. Bateman,
 
 v.
 
 Bode,
 
 55 Ohio St., 224, 230, 231, 45 N. E., 195, said:
 

 “The ballot is the same for all, and gives equal protection and benefit to all. There is no discrimination
 
 *230
 
 against or in favor of any one; and if any inequality arises, it arises not from any inequality caused by the statute, but by reason of inequalities in the persons of the voters, and such inequalities are unavoidable. It is always much more difficult for some electors to cast their ballots than for others. * * # But these difficulties inhere in the men themselves, and not in the law. Before the law all stand equal, with equal protection and equal benefit, and if their condition becomes such as not to enable them to enjoy the protection or reap the benefit, it is their fault or misfortune and not the fault of the law.”
 

 In the case of
 
 State, ex rel. Weinberger, a Taxpayer,
 
 v.
 
 Miller,
 
 87 Ohio St., 12, 99 N. E., 1078, this court in the course of its opinion said:
 

 1 ‘ * * * Laws must be general in their nature. They must afford to everybody equal opportunities under the law, but it is not possible for constitutions or legislation to make all men equal in understanding, intelligence and education, notwithstanding the whole course of our legislation tends in that direction * * *.
 

 it* *
 
 #
 

 <
 
 i ■*
 
 # * jn construing aii laws, whether it be the acts of the General Assembly or a provision of the Constitution of the state, the necessities of the situation must be'taken into account. The very best that can be done is to give to all electors an equal opportunity. In every phase of our social and civic life the uneducated man is at a disadvantage. The opportunities are the same for him as for others, but the unfortunate fact remains and must forever remain that he is not in position to take advantage of these opportunities. It is undoubtedly the duty of the Legislature to guard and protect him in his rights in every possible way, consistent with the welfare of the state and the absolute necessity of securing by ballot an intelligent expression of the people’s will, but human ingenuity has not yet dis
 
 *231
 
 covered, and it is not likely that it ever will discover, any better or fairer means than the written or printed ballot, and if that ballot presents to the uneducated voter the difficulties complained of, the state is powerless to give him further aid, until some Solomon shall devise a plan and method that will obviate all these difficulties, and provide not only equal opportunities to all electors, but also provide some method by which all electors may be able to take advantage of these equal opportunities. ’ ’
 

 The General Assembly has, under the Constitution, broad powers to regulate the conduct of elections. On this subject, 15 Ohio Jurisprudence, 309, Section 4, states as follows:
 

 “The right to vote has its source in and is guaranteed by the Constitution, subject to the qualifications therein prescribed, but the duty of providing the necessary election machinery is one which devolves upon the Legislature, and the manner of the exercise of the right of suffrage is subject, within certain limits, to legislative control and regulation. With respect to the extent and limits of such regulatory power of the Legislature, the well-settled rule is that while the Legislature has no power, directly or indirectly, to deny or abridge the constitutional right of citizens to vote, or unnecessarily to impede its exercise, laws to regulate the exercise of the elective franchise, if reasonable, uniform, and impartial, and calculated to faeiliate the exercise of the right, are clearly within the legislative competency. 45 * *”
 

 The granting to voters handicapped by “physical infirmities” of aid in marking their ballots, although such privilege is not extended to others, is, in the opinion of this court, not unconstitutional legislation. The history of this legislation indicates that such legislation is desirable to preserve the secrecy of the ballot and not encourage the abuse of the privilege of
 
 *232
 
 the aid to the physically infirm voter. The aid is intended to be mechanical in marking the ballot and not informative in the choice of candidates.
 

 The illiterate voter does not stand in the same category. Webster’s New International Dictionary (2 Ed.) defines an “illiterate” as one “ignorant of letters or books; unlettered; uninstructed; uneducated; * * * unable to read.”
 

 The Century Dictionary & Cyclopedia defines an ‘ ‘ illiterate ’ ’ as one ‘ ‘ ignorant of letters or books; having’ little or no learning; unlettered; uncultivated; * * * one unable to read or to write.”
 

 The Oxford English Dictionary defines an “illiterate” as one “ignorant of letters or literature; without book-learning or education; unlettered, unlearned; unable to read.”
 

 Prom these definitions it is apparent that in genera) the “illiterate” fall into the same category as the feebleminded, the ignorant and the uninformed. Aid in respect to these deficiencies would necessarily be of an informative character, which, in the process of casting a secret ballot, would be clearly prohibited.
 

 In keeping with the spirit of the statute, the ballot is the instrument through which the voter may express his choice of candidates, and the expression of choice must be exercised by the voter himself and not by another for him. If, by reason of any physical, educational or mental incapacity, he is unable to make such choice, he suffers an inability to vote but is not deprived of the right to vote.
 

 Doubtless, the General Assembly, in placing the limitations on aid to the voters, as provided by Section 4785-132, General Code, in the light of experience, weighed and balanced the interest of the public as well as the interest of the voters in securing the secrecy and integrity of the ballot and was legally justified in its determination.
 

 
 *233
 
 In the view of this court, the statute in question operates reasonably, uniformly and impartially and, therefore, not unconstitutionally.
 
 City of Xenia v. Schmidt,
 
 101 Ohio St., 437, 130 N. E., 24;
 
 State, ex rel. Turner, Atty. Genl.,
 
 v.
 
 U. S. Fidelity & Guaranty Co.,
 
 96 Ohio St., 250, 117 N. E., 232;
 
 Yee Bow
 
 v.
 
 City of Cleveland,
 
 99 Ohio St., 269, 124 N. E., 132, 12 A. L. R., 1424.
 

 Substantially, the same arguments were adduced against the law providing for the nonpartisan judicial ballot when it was adopted in 1911. In the opinion in the case of
 
 State, ex rel. Weinberger,
 
 v.
 
 Miller, supra,
 
 it is appropriately stated:
 

 ‘ ‘ * * * It is insisted that this act adds another provision to the qualification of an elector, in that it requires him to
 
 be able to read in order to select the candidate for a judicial office for whom he may desire to vote.
 
 Counsel in their argument in support of this proposition, make the mistake of assuming that under the Australian ballot law, and the laws theretofore existing relating to the ballot, the illiterate voter could readily and without any difficulty whatever vote for the candidates of his choice. We are unable to see how the act in question adds anything to the past legislation, or the existing legislation on this subject, that would place such illiterate voter at any greater disadvantage than he was under prior to .its passage.
 

 it#
 
 # #
 

 “The framers of our Constitution and the people of the state when they adopted this section, must have known that there were then, and in all probability would continue to be,
 
 electors of this state unable to read.
 
 Every argument made against this particular law might have been urged with equal force against the adoption of this provision of the Constitution. But, if made, they were made to no purpose, and the provision was adopted and is now unalterable except by the same authority that made it the organic law of tnis
 
 *234
 
 state. It seems strange, almost amusing, that after more than half a century of experience under this constitutional provision, during all of which time the uneducated voter was laboring under equal and at times greater difficulties than are now presented by this law for the nonpartisan election of judicial officers, the discovery should only now be made that all this is unconstitutional. When we turn to the provision of the Constitution which is said to be violated by it, and find that the same objection might have been urged with equal propriety against its adoption, these objections lose all force, for it is apparent that
 
 just so long as we are to have elections by written or printed
 
 ballot,
 
 just so long must the uneducated man find it a difficult matter to vote for the candidate of his choice.
 

 í Í # # #
 

 “In view, therefore, of the fact that the Constitution provides that all elections shall be by ballot; that this means a written or a printed ballot; that every written or printed ballot must necessarily present some difficulties to the voter who cannot read; that there is no constitutional guaranty that the ballot shall bear any mark or device by which a voter may determine from the ballot itself, except from the written or printed matter thereon, which is and which is not the ballot of tue party of his affiliation, it follows that this legislation does not offend against this provision of the Constitution.” (Italics supplied.)
 

 Finally, the respondent claims that, as chief officer in charge of the conduct of elections in the state, he is clothed with the general power to' make reasonable rules and regulations as to the conduct of elections, and that he was within the proper exercise of such power in instructing the election officers to give aid when requested to illiterate voters in marking their ballots.
 

 However, such power to make rules and regulations in such matters is derived from the Constitution and
 
 *235
 
 statutes and must not be exercised in contravention of them. Here, the respondent promulgated a rule or regulation which is in direct conflict with Section 4785-132, General Code.
 

 Having found this statute to be a valid enactment, the court finds that the rule or regulation in question must fall.
 
 Ranson & Randolph Co.
 
 v.
 
 Evatt, Tax Commr.,
 
 142 Ohio St., 398, 407, 408, 52 N. E. (2d), 738;
 
 Kroger Grocery & Baking Co.
 
 v.
 
 Glander, Tax Commr.,
 
 149 Ohio St., 120, 125, 126, 77 N. E. (2d), 921.
 

 The respondent’s demurrer to the petition is’overruled and the writ as prayed for is allowed.
 

 Writ allowed.
 

 Weygandt, C. J., Matthias, Hart, Zimmerman, Stewart, Taft and Favjght, JJ., concur.