[Cite as *State ex rel. Painter v. Brunner*, 128 Ohio St.3d 17, 2011-Ohio-35.]

THE STATE EX REL. PAINTER ET AL. *v.* BRUNNER, SECY. OF STATE, ET AL.

[Cite as *State ex rel. Painter v. Brunner*, 128 Ohio St.3d 17, 2011-Ohio-35.]

*Writ of mandamus issued compelling the secretary of state to rescind directives 2010-80 and 2010-87 and directing the board of elections to review the disputed provisional ballots with the same procedures that it applied to provisional ballots in its review of them leading up to its decision on November 16.*

(No. 2010-2205 — Submitted January 6, 2011 — Decided January 7, 2011.)

IN MANDAMUS.

_____

**Per Curiam.**

{¶ 1} This is an original action for a writ of mandamus to compel respondents Secretary of State Jennifer L. Brunner and the Hamilton County Board of Elections to rescind certain directives and decisions relating to the procedure for an investigation ordered by a federal court. The investigation is to determine whether certain disputed provisional ballots that were not counted in the November 2, 2010 election for judge of the Hamilton County Court of Common Pleas, Juvenile Division, because they had been cast in the wrong precinct due to poll-worker error. Because relators have established their entitlement to the requested extraordinary relief, we grant the writ.

**Facts**

*Election and Initial Count*

{¶ 2} On November 2, 2010, an election was held for judge of the Hamilton County Court of Common Pleas, Juvenile Division, between relator John Williams and intervening respondent Tracie Hunter. The term for the office began on January 1, 2011. On election night, unofficial results indicated that

Williams led Hunter by 2,847 votes. There remained 10,500 provisional ballots as well as a few other ballots that had not been counted.

{¶ 3}  At a November 16 meeting, the board unanimously determined that 849[1] of the provisional ballots were invalid and should not be counted because they had been cast in the wrong precinct. At the same meeting, the board decided that 27 provisional ballots cast at the board of elections during the 28-day period before the November 2 election should be counted because although they were voted in the wrong precinct, that mistake was caused by poll-worker error. Board employees stated that for provisional ballots cast at the board, the voter would ask a board employee to vote, and the employee would give the voter a ballot, so if the voter received the wrong ballot, poll-worker error would have been the cause. The board's investigation into the validity of these ballots at the meeting was generally limited to an examination of election records, poll books, help-line records, and provisional-ballot envelopes. The board voted to remake these ballots so that they would be cast in the proper precincts. After the meeting, the envelopes containing provisional ballots that the board had determined to be valid were opened, and the ballots were counted. The board's final count indicated that Williams had won the election by 23 votes.

*Federal District Court Action*

{¶ 4}  On November 21, Hunter filed a complaint under Section 1983, Title 42, U.S.Code, for a temporary restraining order and declaratory and injunctive relief against the board of elections and its members in the United States District Court for the Southern District of Ohio, Western Division. *Hunter v. Hamilton Cty. Bd. of Elections*, S.D.Ohio (W.D.) No. 1:10-CV-820, 2010 WL 4878957. Hunter claimed that the board and its members had violated her rights

---

[1]  Because one voter cast two provisional ballots in the wrong precinct, any references by the board of elections, courts, or secretary of state to 849 disputed provisional ballots are mistaken. Therefore, this opinion will refer to the number of disputed provisional ballots as 850 rather than 849.

to due process and equal protection by refusing to investigate whether poll-worker error caused some voters to vote at the right polling place but in the wrong precinct, even while correcting other poll-worker error that caused a voter to vote in the wrong precinct. She also sought a temporary restraining order and a preliminary injunction ordering the board and its members to contact provisional voters whose ballots had been rejected, to investigate whether poll-worker error contributed to the rejection of provisional ballots, and to count all provisional ballots where poll-worker error caused the voter to vote in the wrong precinct.

{¶ 5} On November 22, Judge Susan J. Dlott of the federal district court granted Hunter's motion for a preliminary injunction "insofar as it seeks an order commanding [the board and its members] to investigate whether provisional ballots cast in the correct polling location but wrong precinct were improperly cast because of poll worker error." Judge Dlott reasoned that because the board of elections had, at its November 16 meeting, decided to count 27 provisional ballots cast at the board but in the wrong precinct due to "clear poll worker error," its failure to apply similar scrutiny to other provisional ballots cast at the correct polling place but in the wrong precinct "raises equal protection concerns." To prevent irreparable harm to Hunter, Judge Dlott ordered that the board of elections "examine all 849 [850] rejected provisional ballots * * * for reasons attributable to poll worker error." Judge Dlott further ordered that the board "immediately begin an investigation into whether poll worker error contributed to the rejection of the [850] provisional ballots now in issue and include in the recount of the race for Hamilton County Juvenile Court judge any provisional ballots improperly cast for reasons attributable to poll worker error." On November 23, the board certified the results of the election, with Williams certified as the winner over Hunter by a margin of 23 votes—114,989 to 114,966.

*Appeal in Federal Case*

{¶ 6} Williams appealed the federal district court's November 22 preliminary injunction, and after initially granting him a stay of the order, the United States Court of Appeals for the Sixth Circuit dissolved its prior stay and denied Williams's motion for stay on December 1. *Hunter v. Hamilton Cty. Bd. of Elections*, Sixth Circuit No. 10-4481. The court of appeals expressly stated that "[t]his disparate treatment — counting the 26 [27] wrong-precinct ballots based on poll-worker error during early voting without similarly investigating whether poll-worker error led to any of the 849 [850] ballots being cast in the wrong precinct on election day — forms the basis for the injunctive order in this case." On December 16, a divided panel of the court of appeals denied Williams's petition for reconsideration of the denial of his motion for stay. The appeal remains pending before the court of appeals, which has scheduled oral argument for March 1.

*Secretary of State Instructions*

*on Poll-Worker Error Regarding Provisional Ballots*

{¶ 7} In *Northeast Ohio Coalition for the Homeless v. Brunner*, S.D.Ohio (E.D.) No. C2-06-896, the United States District Court for the Southern District of Ohio, Eastern Division, entered a consent decree in April 2010 in a case challenging Ohio's identification and provisional-ballot laws. The plaintiffs in that case, including the intervening respondents in this case, Northeast Ohio Coalition for the Homeless and the Ohio Democratic Party, claimed that some of the plaintiffs' members lacked the identification required by Ohio law to cast a regular ballot on election day and that the provisional-ballot laws have been and will be applied differently and unequally by the state's 88 boards of elections. The decree specified that boards of elections may not reject a provisional ballot cast by a voter who uses only the last four digits of his or her Social Security number as identification if the voter cast a provisional ballot in the correct polling place, but—for reasons attributable to poll-worker error—in the wrong precinct.

**{¶ 8}** On November 1, 2010, the secretary of state issued Directives 2010-73 and 2010-74 to boards of elections, which incorporated the provisions of the consent decree. In Directive 2010-73, the secretary of state stated that the "consent decree provides that an individual voting a provisional ballot using the last four digits of his/her social security number may not be deprived of the fundamental right to vote because of a failure of a poll worker to follow Ohio law," but that "poll worker error will not be presumed and must be demonstrated through evidence."

**{¶ 9}** In Directive 2010-74, which provides guidelines to boards of elections for determining the validity of provisional ballots, the secretary of state reiterated that the boards may not reject a provisional ballot cast by a voter who uses only the last four digits of his or her Social Security number as identification because the voter cast the provisional ballot in the wrong precinct but the correct polling place for reasons attributable to poll-worker error. The secretary of state noted an example of this type of poll-worker error and suggested an investigative procedure for the board's determination of poll-worker error in multiple-precinct polling places:

**{¶ 10}** "Another example of poll worker error is where the provisional ballot affirmation envelope (SOS Form 12-B) contains notations indicating that a poll worker directed the voter to the wrong precinct at a polling location containing multiple precincts. Because it is a poll worker's duty to ensure that the voter is directed to the correct precinct, these notations provide objective evidence that the poll worker did not properly or to the fullest extent required carry out his or her Election Day duties. Similarly, if a board of elections finds multiple provisional ballots voted in the correct polling location but wrong precinct, it should, either in writing, with written responses from the poll workers, or at a public meeting of the board, question the poll workers in that polling location to

determine whether they followed the board's instructions for ensuring that voters were directed to the correct precinct."

{¶ 11} On November 30, eight days after Judge Dlott issued her injunctive order in the federal district court case, the secretary of state issued Directive 2010-79 to the Hamilton County Board of Elections for instructions on supplemental procedures regarding the provisional ballots. According to the secretary of state, the directive was prompted by the board's rejection of over 1,000 provisional ballots cast in the November 2, 2010 general election and the board's lack of any "conclusive review or inquiry to demonstrate the existence or lack thereof of poll worker error in specific provisional ballot situations" in accordance with the consent decree and Directives 2010-73 and 2010-74. The secretary of state reiterated her admonition in Directive 2010-73 that "poll worker error will not be presumed and must be demonstrated through evidence" and her instructions in Directive 2010-74 for the questioning of poll workers when multiple provisional ballots are voted in the correct polling place but the wrong precinct. The directive was limited to the provisional voters specified in the *Northeast Ohio Coalition for the Homeless* consent decree – those voters using only the last four digits of their Social Security numbers as identification to obtain a provisional ballot.

{¶ 12} Directive 2010-79 further defined poll-worker error as occurring "when a poll worker acts contrary to or fails to comply with federal or Ohio law or directive issued by the Secretary of State" and set forth "objective criteria" for determining poll-worker error.

{¶ 13} On December 8, pursuant to Directive 2010-79, board of elections staff determined that 12 of the 850 provisional ballots that it had previously invalidated for being cast in the wrong precinct fell within the category of ballots in the directive that required the questioning of poll workers.

6

{¶ **14**} The next day, after becoming aware of the federal court of appeals' dissolution of its earlier stay of Judge Dlott's preliminary injunction, the secretary of state issued Directive 2010-80. In her directive, the secretary of state observed that although "Judge Dlott's order only applies to the [850] provisional ballots cast in the wrong precinct that were not previously counted by the board of elections," "the investigation of poll worker error required by Judge Dlott's order is broader in scope than Directives 2010-73, 2010-74, and 2010-79 in that, for the [850] provisional ballots at issue, the determination of poll worker error is not limited to persons who voted using only the last four digits of their Social Security number." The secretary of state held that in conducting the investigation ordered by the federal district court, the board must identify the precincts and poll workers for the precincts in which the 850 provisional ballots were cast, contact each poll worker to determine whether he or she followed the board's instructions for ensuring that voters were directed to the correct precinct, question each poll worker to determine whether he or she followed the applicable law, directives, and procedures for casting and processing provisional ballots, and examine the poll books for each precinct and the envelopes for the 850 provisional ballots for indications of poll-worker error in directing voters to the wrong precinct. The secretary of state concluded that if the board determined through its investigation that any of the provisional ballots were cast in the wrong precinct because of poll-worker error, then those ballots should be counted, as required by Judge Dlott's order.

{¶ **15**} On December 11, the board of elections voted unanimously to follow Directive 2010-80 by issuing subpoenas to 2,200 poll workers who had worked at the November 2 election in the precincts and polling places in which the 850 provisional ballots that were the subject of the federal district court's order were cast. The board had previously deadlocked two-to-two on whether to send questionnaires to poll workers in lieu of requiring their statements under

oath. The board also resolved to notify the Supreme Court of Ohio of the "potential for a vacancy on the Hamilton County Court of Common Pleas, Juvenile Division on January 1, 2011 if the board has not concluded its investigation and contact with each poll worker." The board began issuing subpoenas to poll workers on December 13.

{¶ 16} On December 14, the secretary of state issued Advisory 2010-08, which—in addition to the procedures previously set forth in Directives 2010-79 and 2010-80—authorized the board to subpoena poll workers to testify "under oath and recorded by a court reporter, about instructions the poll workers gave to voters who cast provisional ballots in the precincts being investigated and other relevant matters to determine whether poll worker error occurred regarding the provisional ballots in question" or issue questionnaires to poll workers, who could complete the questionnaire and return it within seven days in lieu of testifying pursuant to a subpoena.

{¶ 17} The board's investigation of poll workers began on December 16 and continued the following day, with a total of 75 poll workers examined during those days. On the afternoon of the second day of testimony, the secretary of state issued Directive 2010-87, which ordered the board to accelerate its investigation and determination. According to the secretary, she was concerned that at the board's December 9 and 11 meetings, it had deadlocked on six different matters concerning the steps to be taken to complete the investigation ordered by Judge Dlott, which jeopardized compliance with the judge's order to conduct the investigation "immediately." The secretary was also concerned that there would not be a judge on the Hamilton County Juvenile Court for the open seat when the term commenced on January 1, 2011.

{¶ 18} Therefore, the secretary of state ordered that the board take the following steps to complete the investigation ordered by Judge Dlott: (1) identify and subpoena all poll workers in those precincts where the 850 provisional ballots

had been cast that had been invalidated for having been voted in the wrong precinct, with the subpoenas to be issued no later than December 20 and interviews of poll workers subpoenaed to be completed no later than December 23, (2) issue questionnaires no later than December 20 to all poll workers who had not yet testified and give them two calendar days to complete and send their responses to avoid having to testify, (3) review all documents from the pertinent precincts in which the provisional ballots were cast to determine any indications of poll-worker error, with the review to be completed no later than December 27, (4) conduct a board meeting no later than December 28 to review the results of interviews, questionnaires, and documents to determine whether there was evidence that poll-worker error caused any of the 850 provisional ballots to be cast in the wrong precinct, (5) count any of the 850 provisional ballots for which there was evidence that poll-worker error caused the voter to cast the ballot in the wrong precinct, (6) submit any tie votes that arose in the investigation to the secretary of state with supporting arguments and statements within 48 hours of the vote to permit the matter to be resolved so that the judge who was elected could timely take office, and (7) submit any currently unresolved tie votes to the secretary of state by December 21 or meet on that date to revote these matters.

*Writ Case*

{¶ 19} Three days after the secretary of state issued Directive 2010-87, on December 20, relators, Williams and John W. Painter, a Hamilton County elector, filed this action for a writ of mandamus to compel the secretary of state to rescind Directives 2010-80 and 2010-87 as erroneous interpretations of Ohio law and to compel the board of elections to rescind its decision to subpoena poll workers to testify before the board and instead to review the 850 provisional ballots that are the subject of Judge Dlott's order with exactly the same procedures and scrutiny applied to any provisional ballots during the board's review of them leading up to its decision on November 16, without assuming that poll-worker error occurred in

the absence of specific evidence to the contrary. Relators also requested a writ of prohibition requiring the board of elections to refrain from further contact with and questioning of poll workers.

{¶ 20} Relators additionally filed a motion for temporary injunctive relief pending the court's consideration of their request for mandamus relief, a motion for expedited consideration, and a motion for expedited issuance of an alternative writ. We ordered that respondents file expedited responses to relators' motions. *State ex rel. Painter v. Brunner*, 127 Ohio St.3d 1466, 2010-Ohio-6284, 938 N.E.2d 367. After the respondents filed their responses, we granted the motions of Hunter, the Northeast Ohio Coalition for the Homeless, and the Ohio Democratic Party to intervene as additional respondents, granted relators' motion for temporary injunctive relief, granted an alternative writ on relators' mandamus claim, and issued an expedited briefing and evidence schedule. *State ex rel. Painter v. Brunner*, 127 Ohio St.3d 463, 2010-Ohio-6461, 940 N.E.2d 978. We also dismissed relators' prohibition claim. Id.

{¶ 21} On December 20, because it was impossible for the board to finish questioning the poll workers in the brief time ordered by the secretary of state in Directive 2010-87, the board requested, and the secretary granted, a waiver of the requirement of subpoenaing further poll workers, and questionnaires were sent to the remaining poll workers. On December 27, Judge Dlott denied a motion of the intervening respondents to enjoin this writ case.

{¶ 22} On December 28, the board met and concluded its investigation, which generated a record of the testimony of 77 witnesses and over 800 completed questionnaires. The board unanimously approved the counting of 16 of the disputed 850 provisional ballots and unanimously rejected 565 of them. That left 269 provisional ballots that had been cast in the right polling location but in the wrong precinct. The board split two-to-two on whether to count these 269

provisional ballots. On December 30, the two sides submitted letters to the secretary of state to break the tie vote.

{¶ 23} The parties submitted their evidence and briefs in this case, and the Ohio Republican Party filed an amicus curiae brief in support of relators. This cause is now before this court for our consideration of relators' mandamus claim.

**Legal Analysis**

*Jurisdiction*

{¶ 24} We reject the argument of the secretary of state and the intervening respondents Northeast Ohio Coalition for the Homeless and Ohio Democratic Party that we lack subject-matter jurisdiction over relators' mandamus claim because it is a disguised action for a declaratory judgment and a prohibitory injunction. When the issue is whether the secretary of state has misdirected boards of elections regarding their duties—which is relators' claim here—we have consistently rejected this jurisdictional contention. See, generally, *State ex rel. Myles v. Brunner*, 120 Ohio St.3d 328, 2008-Ohio-5097, 899 N.E.2d 120, ¶ 9, and cases cited therein.

*Laches*

{¶ 25} Hunter and the secretary of state argue that relators' mandamus claim is barred by laches. "Laches may bar an action for relief in an election-related matter if the persons seeking this relief fail to act with the requisite diligence." *Smith v. Scioto Cty. Bd. of Elections*, 123 Ohio St.3d 467, 2009-Ohio-5866, 918 N.E.2d 131, ¶ 11. "The elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party." *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections* (1995), 74 Ohio St.3d 143, 145, 656 N.E.2d 1277.

{¶ 26} Hunter claims that because relators are indirectly challenging the suggestion in Secretary of State Directive 2010-74 that boards of elections

investigate poll-worker error by questioning poll workers if the board finds multiple provisional ballots voted in the correct polling location but wrong precinct, which is repeated in Directive 2010-79, and because the first directive was issued on November 1, relators' 49-day delay in filing this mandamus action on December 20 constituted an unreasonable delay. Similarly, the secretary of state claims that any challenge to Directive 2010-79, which was issued on November 30, was unreasonably delayed.

{¶ 27} Respondents are wrong. Relators are challenging Directives 2010-80 and 2010-87, which were issued on December 9 and 17. Directives 2010-74 and 2010-79 were restricted to those situations covered by the federal consent decree in *Northeast Ohio Coalition for the Homeless* and are not challenged by relators in this action. Relators' 11-day and three-day delays to contest Directives 2010-80 and 2010-87 were not unreasonably long, and because of the abbreviated statutory time period to generally resolve these disputes, an expedited schedule for briefing and evidence would have been warranted even if relators had filed this action on December 17. Although the secretary of state also argues that the R.C. 3505.32(A) deadline for finishing the board's canvass would probably expire before a recount after resolution of the pending litigation, given the delays attributable to the litigation by both Hunter and Williams, we are persuaded that this is a deadline that might pass even under the best of circumstances. See *State ex rel. Squire v. Taft* (1994), 69 Ohio St.3d 365, 369, 632 N.E.2d 883. No prejudice to respondents thus occurred.

{¶ 28} Therefore, because under the circumstances, relators acted with the requisite diligence in instituting this action for extraordinary relief, we reject Hunter's claim that this case is barred by laches.

*Mandamus*

{¶ 29} Relators request a writ of mandamus to compel the secretary of state to rescind Directives 2010-80 and 2010-87 because they are an erroneous

interpretation of law and to compel the board of elections to refrain from taking action to comply with the secretary of state's instructions. In addition, relators request a writ of mandamus directing the board of elections to review the disputed provisional ballots with exactly the same procedures and scrutiny applied to the board's review of provisional ballots leading to its November 16 decisions, without assuming that poll-worker error occurred in the absence of specific evidence to the contrary.

{¶ 30} "To be entitled to the requested writ, relators must establish a clear legal right to the requested relief, a corresponding clear legal duty on the part of the secretary of state [and the board of elections] to provide it, and the lack of an adequate remedy in the ordinary course of the law." *State ex rel. Heffelfinger v. Brunner*, 116 Ohio St.3d 172, 2007-Ohio-5838, 876 N.E.2d 1231, ¶ 13; see also *State ex rel. Husted v. Brunner*, 123 Ohio St.3d 288, 2009-Ohio-5327, 915 N.E.2d 1215, ¶ 8. "[I]f the secretary of state 'has, under the law, misdirected the members of the boards of elections as to their duties, the matter may be corrected through the remedy of mandamus.' " *State ex rel. Colvin v. Brunner*, 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979, ¶ 20, quoting *State ex rel. Melvin v. Sweeney* (1950), 154 Ohio St. 223, 226, 43 O.O. 36, 94 N.E.2d 785. Notwithstanding the secretary's argument to the contrary, because of our recognition of mandamus as the appropriate remedy and the need to resolve this election dispute in a timely fashion, relators lack an adequate remedy in the ordinary course of the law. Id. at ¶ 31.

{¶ 31} For the reasons that follow, the secretary of state erred in issuing the postelection directives and instructions concerning the investigation of provisional ballots that had previously been invalidated by the board of elections because they had been cast in the wrong precinct.

*Ohio Statutory Law for Provisional Ballots Cast*

*in the Incorrect Precinct*

**{¶ 32}** Initially, the United States Constitution " 'leaves the conduct of state elections to the states.' " *Warf v. Bd. of Elections of Green Cty., Ky.* (C.A.6, 2010), 619 F.3d 553, 559, quoting *Gamza v. Aguirre* (C.A.5, 1980), 619 F.2d 449, 453. For example, the Help America Vote Act, Section 15301 et seq., Title 42, U.S.Code, " 'conspicuously leaves * * * to the States' the determination of 'whether a provisional ballot will be counted as a valid ballot.' " *State ex rel. Skaggs v. Brunner* (C.A.6, 2008), 549 F.3d 468, 477, quoting *Sandusky Cty. Democratic Party v. Blackwell* (C.A.6, 2004), 387 F.3d 565, 577.

**{¶ 33}** "One aspect common to elections in almost every state is that voters are required to vote in a particular precinct. Indeed, in at least 27 of the states using a precinct voting system, including Ohio, a voter's ballot will only be counted as a valid ballot if it is cast in the correct precinct." *Sandusky Cty. Democratic Party*, 387 F.3d at 568. "The advantages of the precinct system are significant and numerous: it caps the number of voters attempting to vote in the same place on election day; it allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies; it allows each precinct ballot to list only those votes a citizen may cast, making ballots less confusing; it makes it easier for election officials to monitor votes and prevent election fraud; and it generally puts polling places in closer proximity to voter residences." Id. at 569.

**{¶ 34}** "Under Ohio law, then, only ballots cast in the correct precinct may be counted as valid." Id. at 578. The plain language of several statutes so provides. See R.C. 3503.01(A) (every qualified elector "may vote at all elections in the precinct in which the citizen resides"); R.C. 3505.181(C)(2)(a) (providing that "if an individual refuses to travel to the polling place for the correct jurisdiction * * * [a] provisional ballot cast by that individual shall not be opened or counted" if the "individual is not properly registered in that jurisdiction") and (E)(1) (defining "jurisdiction" for purposes of provisional-ballot provisions as

"the precinct in which a person is a legally qualified elector"); R.C. 3505.182 (requiring each individual casting a provisional ballot to execute a written affirmation stating that he or she "understand[s] that * * * if the board of elections determines that" the individual is not a resident of the precinct in which the ballot was cast, the provisional ballot will not be counted); R.C. 3505.183(B)(4)(a)(ii) (if board determines that the "individual named on the affirmation is not eligible to cast a ballot in the precinct or for the election in which the individual cast the provisional ballot," "the provisional ballot envelope shall not be opened, and the ballot shall not be counted"); and R.C. 3599.12(A)(1) (prohibiting any person from voting or attempting to vote in any election "in a precinct in which that person is not a legally qualified elector") and (B) (making a violation of that section a felony of the fourth degree). In fact, as recently as November 2009, the secretary of state's office acknowledged that Ohio law "does not provide any exception when the ballot is cast in the wrong precinct due to poll worker error."

{¶ 35} These statutes do not authorize an exception based on poll-worker error to the requirement that ballots be cast in the proper precinct in order to be counted. " '[T]he general rule is that unless there is language allowing substantial compliance, election statutes are mandatory and must be strictly complied with.' " *State ex rel. Stewart v. Clinton Cty. Bd. of Elections*, 124 Ohio St.3d 584, 2010-Ohio-1176, 925 N.E.2d 601, ¶ 27, quoting *Husted*, 123 Ohio St.3d 288, 2009-Ohio-5327, 915 N.E.2d 1215, ¶ 15. We are not authorized to add an exception that is not contained in the express language of these statutory provisions. *State ex rel. Stoll v. Logan Cty. Bd. of Elections*, 117 Ohio St.3d 76, 2008-Ohio-333, 881 N.E.2d 1214, ¶ 39 ("the statute contains no exception, and we cannot add one to its express language"); cf. *State ex rel. Reese v. Cuyahoga Cty. Bd. of Elections*, 115 Ohio St.3d 126, 2007-Ohio-4588, 873 N.E.2d 1251, ¶ 31, and cases cited therein (mistaken or erroneous statement or advice by board of

elections did not estop board from acting contrary to statement by invalidating petition).

{¶ 36} Therefore, under Ohio statutory law, the secretary of state's instructions to the board of elections, which required an investigation into whether poll-worker error caused any of the 850 provisional ballots to be cast in the wrong precinct, were erroneous because there is no exception to the statutory requirement that provisional ballots be cast in the voter's correct precinct.

*Federal Consent Decree and Injunction*

{¶ 37} Nevertheless, the secretary of state and the intervening respondents assert that the secretary's postelection instructions were warranted because of the federal consent decree in *Northeast Ohio Coalition for the Homeless* (Apr. 19, 2010), S.D. Ohio (E.D.) No. C2-06-896, as well as Judge Dlott's November 22 injunctive order in *Hunter* (Nov. 22, 2010), S.D. Ohio (W.D.) No. 1:10CV820, 2010 WL 4878957. As the state's chief election officer pursuant to R.C. 3501.04, the secretary of state has many election-related duties, including the duties to "[i]ssue instructions by directives and advisories * * * to members of the boards as to the proper methods of conducting elections," "[p]repare rules and instructions for the conduct of elections," and "[c]ompel the observance by election officers in the several counties of the requirements of the election laws." R.C. 3501.05(B), (C), and (M). There is nothing in these statutes that restricts the secretary of state's instructions to boards of elections to *state* election law. Therefore, the secretary of state also has a duty to instruct election officials on the applicable requirements of federal election law as well as federal court orders that are applicable to them.

{¶ 38} The federal district court's consent decree in *Northeast Ohio Coalition for the Homeless* (Apr. 19, 2010), S.D. Ohio (E.D.) No. C2-06-896, however, does not justify the secretary of state's issuance of Directives 2010-80 and 2010-87 and Advisory 2010-08 to require the board of elections to contact

poll workers for each of the disputed provisional ballots that were cast in the wrong precinct and to question them to determine whether poll-worker error caused the ballots to be cast in the improper precinct. The decree specifies only that boards of elections may not reject a provisional ballot "cast by a voter, *who uses only the last four digits of his or her social security number as identification*" for any of several reasons, including that the "voter cast his or her provisional ballot in the wrong precinct, but in the correct polling place, for reasons attributable to poll worker error." (Emphasis added.) Id. at 4. The secretary of state's postelection directives and advisory applied more expansively to the 850 provisional ballots cast in the wrong precinct.

{¶ 39} Notably, the secretary of state's preelection Directive 2010-74, which was issued on November 1, 2010, and postelection Directive 2010-79, issued on November 30, 2010, both of which suggested that the board question poll workers to determine whether poll-worker error caused provisional ballots in multiple-precinct polling locations to be cast in the wrong precinct, were accordingly limited to provisional ballots cast by voters who used only the last four digits of their Social Security numbers as identification.

{¶ 40} Nor did the federal district court's November 22, 2010 injunctive order in *Hunter*, S.D. Ohio No. 1:10CV820, 2010 WL 4878957, justify the secretary of state's postelection instructions directing the board of elections to question poll workers concerning the 850 provisional ballots cast in the wrong precincts. The court's order was premised on the fact that the board of elections had carved out an exception from the general Ohio rule that provisional ballots not be counted if they were cast in the wrong precinct, apart from the exception provided by the federal consent decree in *Northeast Ohio Coalition for the Homeless* (Apr. 19, 2010), S.D. Ohio (E.D.) No. C2-06-896, for voters using only the last four digits of their Social Security number as identification who cast provisional ballots in the wrong precinct due to poll-worker error. *Hunter*, 2010

WL 4878957, at *4. The district court–as well as the court of appeals in its decision denying Williams's motion for stay–relied on the board's determination that 27 provisional ballots cast in the wrong precinct at the board of elections should be counted because the evidence established that the improper casting of these votes must have been attributable to poll-worker error. Id. But there is no indication that any poll workers had been contacted and questioned by the board when it made its November 16 decision to count these provisional ballots, so any equal-protection claim did not require an investigation–it merely required the same inquiry that the board had engaged in for its initial determination of the validity of the provisional ballots.

{¶ 41} In fact, insofar as the secretary of state's postelection instructions conflict with her preelection instructions regarding the validity of provisional ballots cast at improper precincts, they are erroneous. Cf. *State ex rel. Skaggs v. Brunner*, 120 Ohio St.3d 506, 2008-Ohio-6333, 900 N.E.2d 982, ¶ 58 ("By changing her instructions for one county but not for others after the election at the request of a candidate, the secretary of state failed to ensure that the same rules would be applied to each provisional voter of every county in the state"). That is, in attempting to resolve equal-protection concerns implicated by the board's counting 27 provisional ballots cast in the wrong precinct at the board, the secretary of state may have caused much greater equal-protection concerns. See *Bush v. Gore* (2000), 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 ("the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter"); *League of Women Voters of Ohio v. Brunner* (C.A.6, 2008), 548 F.3d 463, 476 ("[t]he right to vote includes the right to have one's vote counted on equal terms with others").

{¶ 42} And if the secretary's directives requiring the questioning of poll workers for provisional ballots cast in the wrong precinct were extended to the

entire state, it is doubtful that the time limits for resolving elections would ever be met. See R.C. 3505.183(E)(2) (board of elections shall examine eligibility of persons who cast provisional ballots by, at the latest, the 11th day after election); R.C. 3505.32(A) (board of elections shall complete canvass of election returns not later than the 21st day after the election, and canvass shall be deemed final 81 days after the election).

{¶ 43} The secretary of state and boards of elections have general investigative authority over election irregularities, but this power is generally limited to reporting possible violations to the attorney general or prosecuting attorney for prosecution. See R.C. 3501.05(N)(1) and 3501.11(J). In this case, where the federal court orders did not require the specific type of investigation directed by the secretary of state and conducted by the board of elections and the investigation was plainly otherwise violative of Ohio law, we hold that the secretary and the board erred in so acting.[2]

{¶ 44} Therefore, the secretary of state's postelection instructions to the board of elections are not justified by either federal court decision.

*Federalism and Collateral Attack*

{¶ 45} Respondents argue that the requested writ of mandamus should be denied because of the Supremacy Clause and the collateral-attack doctrine.

{¶ 46} Clause 2, Article VI of the United States Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land; and the Judges in

---

[2] The secretary of state, however, by issuing Directive 2010-87, did not act in clear disregard of R.C. 3501.11(X) by truncating the 14-day period to a two-day period for a board of elections to submit a tie vote to the secretary for resolution. See R.C. 3501.11(X) ("In all cases of a tie vote or a disagreement in the board, if no decision can be arrived at, the director or chairperson shall submit the matter in controversy, not later than fourteen days after the tie vote or the disagreement, to the secretary of state, who shall summarily decide the question, and the secretary of state's decision shall be final"). As the secretary of state observes, there may be circumstances that warrant the secretary's instructing board members that any statutory limits be shortened to further expedite matters in election situations.

every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." "It has long been settled that the Supremacy Clause binds state courts to decisions of the United States Supreme Court on questions of federal statutory and constitutional law." *State v. Burnett* (2001), 93 Ohio St.3d 419, 422, 755 N.E.2d 857. But as for decisions of lower federal courts, this court has observed, "We are reluctant to abandon our role in the system of federalism created by the United States Constitution until the United States Supreme Court directs us otherwise." Id. at 424. Thus, "we are not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court. We will, however, accord those decisions some persuasive weight." Id; cf. *Skaggs*, 549 F.3d at 477, quoting *Planned Parenthood of Cincinnati Region v. Strickland* (C.A.6, 2008), 531 F.3d 406, 410 ("To allow federal courts free rein in determining whether and under what circumstances a partially deficient provisional ballot will count–under state law– would deprive state courts of their long-established role as the 'final arbiter on matters of state law' ").

{¶ 47} Moreover, collateral or indirect attacks on judgments are disfavored. *Ohio Pyro, Inc. v. Ohio Dept. of Commerce, Div. of State Fire Marshal*, 115 Ohio St.3d 375, 2007-Ohio-5024, 875 N.E.2d 550, ¶ 22. A collateral attack is " 'an attempt to defeat the operation of a judgment, in a proceeding where some new right derived from or through the judgment is involved.' " *Fawn Lake Apts. v. Cuyahoga Cty. Bd. of Revision* (1999), 85 Ohio St.3d 609, 611, 710 N.E.2d 681, quoting *Kingsborough v. Tousley* (1897), 56 Ohio St. 450, 458, 47 N.E. 541.

{¶ 48} Neither the Supremacy Clause nor the collateral-attack doctrine prevents the requested extraordinary relief here. As noted previously, the two federal court orders do not resolve the issues raised here. The *Northeast Ohio Coalition for the Homeless* consent decree did not require the investigative

20

procedures specified by the secretary of state for ballots cast in the wrong precinct that were not covered by the decree, and while the *Hunter* injunction ordered an investigation and an examination of the disputed provisional ballots, it did not require the specific investigation ordered by the secretary of state and conducted by the board of elections. As Judge Dlott herself recognized in her order in *Hunter* denying the motion of the intervening respondents in this case to enjoin this state-court action, "[i]t is within the province of the Ohio Supreme Court to determine whether Secretary of State Jennifer L. Brunner's directives comply with state law governing election procedures, and this Court will not enjoin the Ohio Supreme Court from doing so."

*Presumption against Poll-Worker Error*

{¶ 49} Relators also request a writ of mandamus to compel the board of elections to review the disputed provisional ballots with the same procedures it used in its review of the provisional ballots in its initial November 16 determination, without assuming that poll-worker error occurred in the absence of specific evidence to the contrary. This request has merit. As noted previously, under Ohio law, these ballots should not be counted, so no investigation would normally be warranted. And Judge Dlott's injunctive order did not require the investigation ordered by the secretary of state and conducted by the board of elections here. At best, any equal-protection claim would have merely required the same examination that the board conducted in concluding — incorrectly under Ohio law — that 27 provisional ballots cast in the wrong precinct at the board of elections during the early-voting period should be counted, even though they were cast in the wrong precinct due to poll-worker error. That review was limited to an examination of the poll books, help-line records, and provisional-ballot envelopes and emanated from the uncontroverted evidence that these ballots were cast in the wrong precinct due to poll-worker error.

**{¶ 50}** Moreover, as we explicitly held in another case challenging the secretary of state's instructions concerning the validity of disputed provisional ballots, see *Skaggs*, 120 Ohio St.3d 506, 2008-Ohio-6333, 900 N.E.2d 982, at ¶ 51, quoting *State ex rel. Speeth v. Carney* (1955), 163 Ohio St. 159, 186, 56 O.O. 194, 126 N.E.2d 449, election officials err in presuming poll-worker error because " '[i]n the absence of evidence to the contrary, public officers, administrative officers and public authorities, within the limits of the jurisdiction conferred upon them by law, will be presumed to have properly performed their duties in a regular and lawful manner and not to have acted illegally or unlawfully.' "

**{¶ 51}** Insofar as two of the board members appear to presume poll-worker error in connection with the 269 provisional ballots cast in the wrong precinct but correct location in a multiple-precinct polling place, this is incorrect. Neither they nor respondents could rely on evidence obtained from the improper investigation ordered by the secretary of state and conducted by the board. Finally, the board members erred in relying on a statistical analysis comparable to the one we rejected in *State ex rel. Yiamouyiannis v. Taft* (1992), 65 Ohio St.3d 205, 208-209, 602 N.E.2d 644, to support their claim that poll-worker error occurred.

**Conclusion**

**{¶ 52}** Based on the foregoing, relators have established their entitlement to the requested extraordinary relief in mandamus. The secretary of state's postelection instructions to the board of elections were not justified by Ohio law or the pertinent federal court orders. Therefore, we grant relators a writ of mandamus to compel the secretary of state to rescind Directives 2010-80 and 2010-87 and to compel the board of elections to rescind its decisions made pursuant to those directives and to instead review the 850 provisional ballots that are the subject of Judge Dlott's order and are not subject to the consent decree in *Northeast Ohio Coalition for the Homeless*, with exactly the same procedures and

scrutiny applied to any provisional ballots during the board's review of them leading up to its decision on November 16, without assuming that poll-worker error occurred in the absence of specific evidence to the contrary.

Writ granted.

O'CONNOR, C.J., and LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

PFEIFER and MCGEE BROWN, JJ., dissent.

_____

**PFEIFER, J., dissenting.**

{¶ 53} I dissent from today's decision but not on the merits. Instead, my concern is the unnecessary expediting of this case. The rush to judgment was started by the secretary of state in a fairly transparent attempt to play a role in the resolution of the election before her successor takes office on January 10. Now, this court is along for the ride.

{¶ 54} The two-judge juvenile court remains in good hands in Cincinnati: Judge Karla Grady remains on the bench, and former Chief Justice Eric Brown assigned retired juvenile judge Thomas Louden to preside as the second juvenile judge through February while this election remains unresolved. Thus, we have time to make a decision. This court would benefit from ordering relators to file a reply brief in this case because some of the defenses, e.g., laches, lack of jurisdiction, the Supremacy Clause, and the collateral-attack doctrine, raised by respondents in their briefs have arguably not been sufficiently addressed by relators in their merit brief. I would order relators to file a reply brief by January 13, 2011, so that all the pertinent issues have been addressed. And in a case that may involve the profound unfairness of votes not being counted because registered voters were directed by poll workers to the wrong table in a multiple-precinct polling place, we should make the most informed decision possible.

**{¶ 55}** Moreover, although the secretary of state is in her final days of office, she does have a successor. And it is possible that this writ case will be rendered moot if her successor, who takes office on Monday, January 10, rescinds the challenged directives. There is thus no need to resolve this case before the secretary of state elect has had the opportunity to give his opinion on this matter. By acting more quickly than is necessary under these circumstances, we are acting contrary to "our general rules precluding advisory opinions and extolling judicial restraint." See *State ex rel. LetOhioVote.Org v. Brunner*, 125 Ohio St.3d 420, 2010-Ohio-1895, 928 N.E.2d 1066, ¶ 22. Therefore, I dissent.

———————————

Taft, Stettinius & Hollister, L.L.P., R. Joseph Parker, W. Stuart Dornette, and John B. Nalbandian, for relators.

Richard Cordray, Attorney General, and Richard N. Coglianese, Erick D. Gale, and Michael J. Schuler, Assistant Attorneys General, for respondent Secretary of State Jennifer Brunner.

Gerhardstein & Branch Co., L.P.A., Jennifer L. Branch, and Alphonse A. Gerhardstein, for intervening respondent Tracie Hunter.

Porter, Wright, Morris & Arthur, L.L.P., Caroline H. Gentry, Sheena L. Little, and Brad Hughes; The Chandra Law Firm, L.L.C., and Subodh Chandra; and McTigue Law Group, Donald J. McTigue, and Mark A. McGinnis, for intervening respondents Northeast Ohio Coalition for the Homeless and Ohio Democratic Party.

Bricker & Eckler, L.L.P., Anne Marie Sferra, James P. Schuck, and Christopher N. Slagle, urging granting of the writ for amicus curiae, Ohio Republican Party.

———————————