**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Ohio Democratic Party v. LaRose*, Slip Opinion No. 2024-Ohio-4953.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-4953

THE STATE EX REL. OHIO DEMOCRATIC PARTY ET AL *v*. LAROSE, SECY. OF STATE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Ohio Democratic Party v. LaRose*, Slip Opinion No. 2024-Ohio-4953.]**

*Elections—Mandamus—Writ sought to compel secretary of state to rescind Directive 2024-21—Relators' claims are barred by doctrine of laches—Writ denied.*

(No. 2024-1361—Submitted October 10, 2024—Decided October 15, 2024.)

IN MANDAMUS.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER, DEWINE, and POWELL, JJ. BERGERON, J., dissented, with an opinion joined by HOFFMAN, J. BRUNNER, J., dissented, with an opinion joined by BERGERON and HOFFMAN, JJ. PIERRE H. BERGERON, J., of the First District Court of Appeals, sat for DONNELLY, J. WILLIAM B. HOFFMAN, J., of the Fifth District Court of Appeals,

sat for STEWART, J. STEPHEN W. POWELL, J., of the Twelfth District Court of Appeals, sat for DETERS, J.

**Per Curiam.**

{¶ 1} In this expedited election case, relators, the Ohio Democratic Party and voters Norman Wernet and Eric Duffy, have filed an original action in mandamus against respondent, Secretary of State Frank LaRose. Relators seek a writ ordering the secretary to rescind a directive he issued. The directive requires that a person delivering an absentee ballot for a family member or disabled voter to a county board of elections (1) complete an attestation at the board of elections attesting that the person is authorized to return the ballot and (2) not return the ballot to a drop box. Because we find that relators' claims are barred by laches, we deny the writ.

## I. FACTUAL, PROCEDURAL, AND LEGAL BACKGROUND

### A. Absentee voting in Ohio

{¶ 2} Ohio law allows electors to vote by absentee ballot. *See* R.C. Ch. 3509. An elector may return his or her absentee ballot to a county board of elections by mail or in person. R.C. 3509.05(C)(1).

{¶ 3} A county "board of elections may place not more than one secure receptacle outside the office of the board, on the property on which the office of the board is located, for the purpose of receiving absent voter's [sic] ballots under this section." R.C. 3509.05(C)(3)(a). These secure receptacles are commonly known as "drop boxes." Drop boxes shall be open to receive ballots "at all times" beginning the first day after the close of voter registration before the election and ending at 7:30 p.m. on election day. R.C. 3509.05(C)(3)(b). They must be monitored by recorded video surveillance and may be opened only by a bipartisan team of election officials. R.C. 3509.05(C)(3)(c) and (d).

2

{¶ 4} Ohio statutes provide that only an elector, employees or contractors of the postal service or a private carrier, and certain specified family members of an elector may return an elector's absentee ballot to the board of elections. *See* R.C. 3509.05(C)(1) and 3599.21(A)(9). Knowingly returning an absentee ballot as an unauthorized person or possessing the absentee ballot of another person without authorization is a felony of the fourth degree. R.C. 3599.21(A)(9) and (10) and (C).

### B. *The federal-court case*

{¶ 5} In December 2023, several plaintiffs filed a complaint in the United States District Court for the Northern District of Ohio against Secretary LaRose and other defendants, alleging, among other claims, that the federal Voting Rights Act preempted portions of Ohio's absentee-ballot laws. *League of Women Voters of Ohio v. LaRose*, 2024 WL 3495332, *2, 7 (N.D.Ohio July 22, 2024). Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. 10508. The plaintiffs claimed that the Ohio law that prohibited persons other than an elector and certain specified family members of an elector from returning an elector's absentee ballot could not stand because the law did not allow a disabled voter to choose "'a person of the voter's choice.'" *League of Women Voters of Ohio* at *7, quoting 52 U.S.C. 10508. The secretary and the other defendants insisted that limiting the categories of persons from whom a voter covered by the Voting Rights Act could choose did not meaningfully reduce or remove the ability of the covered voter to choose a person of the voter's choice. *Id.* at *10.

{¶ 6} On July 22, 2024, the district court rejected the secretary and the other defendants' argument and issued an order granting summary judgment to the plaintiffs on their Voting Rights Act claim. *Id.* at *22. The court found that Section 208 of the Voting Rights Act "allows a disabled voter to select a person of their

choice to assist them with voting, including the return of a disabled voter's absentee ballot. To the extent that R.C. 3599.21(A)(9) and R.C. 3599.21(A)(10) prohibit such assistance by limiting who a disabled voter may select to assist them in this manner, the statutes are PREEMPTED by Section 208 of the Voting Rights Act." (Capitalization in original.) *Id.* The court permanently enjoined the enforcement of R.C. 3599.21(A)(9) and (10) "against any disabled voter or against any individual who assists any disabled voter with the return of the disabled voter's absentee ballot to the extent such enforcement contradicts Section 208 of the Voting Rights Act, with immediate effect." *Id.* There is no indication in the record that an appeal was taken from the district court's decision, and the time for filing an appeal has passed.

{¶ 7} The parties here agree that the federal court's injunction expands the categories of persons who may return an elector's absentee ballot to include the person a disabled voter chooses to assist with the return of the disabled voter's ballot.

### C. *The secretary's directives and advisory*

{¶ 8} Following the issuance of the federal-court injunction, on August 31, the secretary issued Directive 2024-21 to all county boards of elections. The directive asserts interests in preventing "ballot harvesting," ensuring "the integrity of each vote delivered on behalf of an absent voter," and protecting the security of the delivery of absentee ballots. It states that "[t]o ensure compliance with state and federal law, and to protect the security of absentee ballot delivery, the only individual who may use a drop box to return the ballot is the voter." It also states that "[a]ll individuals who are delivering ballots for a family member or disabled voter may either mail the ballot to the county board of elections or return the ballot to a county board of elections official at the county board of elections office and complete an attestation at the board of elections."

4

{¶ 9} The directive requires county boards of elections to provide a person returning an absentee ballot for another person with an attestation form to declare, under penalty of election falsification, that the person is a family member of the elector or is assisting a disabled voter. The prescribed attestation instructs the attestor to deliver the attestation "with the ballot to a board of elections official in the board of elections office."

{¶ 10} In addition, the directive orders county boards of elections to post a notice at or on the drop box that includes (1) instructions about who is eligible to return an absentee ballot and (2) instructions for anyone other than the voter attempting to return an absentee ballot. The secretary included a template sign with the directive. The template states: "If you are assisting another voter with the return of a ballot, you MUST see a board of elections official who can provide you with the necessary attestation form." (Capitalization in original.) The template also states that anyone who is unauthorized to return a ballot on behalf of a voter could be charged with a fourth-degree felony.

{¶ 11} On September 17, the secretary issued another directive, Directive 2024-24. This second directive informs county boards of elections about the district court's injunction in *League of Women Voters of Ohio*, 2024 WL 3495332, and says that a disabled voter may select a person of his or her choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union, to return his or her absentee ballot. The second directive refers the boards of elections to "Directive 2024-21 regarding procedures for the return of an absent voter's ballot."

{¶ 12} On September 20, the secretary issued Advisory 2024-03 to county boards of elections "as a clarification to Directive 2024-21." The advisory states that boards of elections are permitted and encouraged to set up a "drive-through ballot drop-off system during periods of high-volume turnout."

*D. This mandamus action*

{¶ 13} On September 27, relators filed their verified complaint in mandamus. The Ohio Democratic Party is a legally recognized major political party in Ohio. On its behalf, the chairwoman of the party avers in an affidavit that many of the party's members rely on authorized family members or, for members with disabilities, designated assistants to return absentee ballots and that the party and its members will be harmed by additional burdens imposed on voting by Directive 2024-21.

{¶ 14} Wernet avers that he is a qualified and registered voter in Ohio. He avers that he plans to cast an absentee ballot in this year's general election and will drop off his ballot at the drop box and that he plans to assist his wife by dropping off her absentee ballot at the drop box. He does not want to return his ballot by mail because of a recent experience he had with mail theft. He is a senior citizen and would have difficulty returning the ballots if Directive 2024-21 is not rescinded, because he would have to park his car, potentially walk several blocks, and possibly wait in line to complete an attestation form.

{¶ 15} Duffy avers that he is a qualified and registered voter in Ohio. He is blind. He has been in and out of the hospital and plans to vote absentee because he is unsure if his health will permit him to vote in person this year. He intends to rely on the assistance of a trusted friend to return his absentee ballot in person. His friend, however, has difficulty walking, and Duffy is unsure whether his friend can park her car, walk into the county board of elections, and wait in line without pain and significant exertion. His friend's limited mobility makes him "not feel comfortable" asking her to help him if she will be required to enter the board of elections' office. He thus claims that if Directive 2024-21 is not rescinded, he will be unable to receive voting assistance from the person of his choice.

{¶ 16} Relators assert that Directive 2024-21 unlawfully contradicts Ohio statutory law, violates the Equal Protection Clause of the Ohio Constitution, and

violates the federal Voting Rights Act.  They raise no other arguments in support of their request for a writ of mandamus concerning the directive.  Relators seek a writ ordering the secretary to rescind Directive 2024-21 and "instruct county election officials to accept absentee ballots from voters and their authorized family members and assistants without the Directive's legally unauthorized attestation, including via drop box."

{¶ 17} Because this case relates to an election within 90 days, it is classified as an expedited election case under S.Ct.Prac.R. 12.08.  Sua sponte, we also issued an order further expediting the case schedule.  2024-Ohio-4746.  The case is now fully briefed.  In addition, the Republican National Committee and the Ohio Republican Party jointly filed a motion to intervene as respondents.  The League of Women Voters of Ohio and the Ohio State Conference of the NAACP jointly filed an amici curiae brief in support of relators.

## II.  ANALYSIS

### A.  *The motion to intervene*

{¶ 18} On October 4, the day the secretary's merit brief was due, the Republican National Committee and the Ohio Republican Party jointly moved to intervene as respondents.  They included a proposed answer and a merit brief. Relators oppose the motion.

{¶ 19} The political parties seek intervention of right under Civ.R. 24(A) or, alternatively, permissive intervention under Civ.R. 24(B).  We have often allowed political parties to intervene in election-law cases.  *See, e.g.*, *State ex rel. Ohio Democratic Party v. LaRose*, 2020-Ohio-1253, ¶ 2; *State ex rel. Painter v. Brunner*, 2011-Ohio-35, ¶ 20.  However, a request for intervention—either of right or permissive—must be *timely*.  Civ.R. 24(A) and (B).  Here, the secretary's answer was due on October 1 and relators' brief was due on October 2.  2024-Ohio-4746. Briefing finished on October 7.  Given the short life of this case, the motion to intervene came as close to the end of the case as to its beginning.  Allowing the

political parties to intervene at this juncture would prejudice relators because they had to file their merit brief before the would-be intervenors filed their proposed answer. We could reopen briefing and set a new schedule, but that would significantly delay this time-sensitive case.

{¶ 20} As such, we deny the political parties' motion to intervene as untimely. We do, however, sua sponte convert their merit brief to an amici curiae brief. *See State ex. rel. Linnabary v. Husted*, 2014-Ohio-1417, ¶ 11-12 (denying motion to intervene but accepting proposed intervenor's brief as an amicus brief).

*B. Laches defense*

{¶ 21} The secretary argues as an affirmative defense that relators' claims are barred by laches. We agree.

{¶ 22} "'Extreme diligence and promptness are required in elections-related matters.' " *State ex rel. Clark v. Twinsburg*, 2022-Ohio-3089, ¶ 11, quoting *State ex rel. Commt. for the Charter Amendment, City Trash Collection v. Westlake*, 2002-Ohio-5302, ¶ 16. "Laches will bar an action when there is (1) an unreasonable delay or lapse of time in asserting a right, (2) the absence of an excuse for the delay, (3) actual or constructive knowledge of the injury or wrong, and (4) prejudice to the opposing party." *Id.* With respect to the fourth factor, "the prejudice must be material." *State ex rel. Pennington v. Bivens*, 2021-Ohio-3134, ¶ 26.

{¶ 23} These four factors are present here. The secretary issued Directive 2024-21 on Saturday, August 31. Relators submit as evidence multiple news articles written about the directive shortly after it was issued, and the Ohio Democratic Party—an entity familiar with the election process—assuredly knew about the directive at that time. The first day relators could have challenged the directive was Tuesday, September 3 (the day after Labor Day). Yet, relators did not file their complaint until 24 days later on September 27. We have found similar delays in election cases to be unreasonable. *See, e.g.*, *State ex rel. Syx v. Stow City Council*, 2020-Ohio-4393, ¶ 11 (22-day delay); *State ex rel. Fuller v. Medina Cty.*

*Bd. of Elections*, 2002-Ohio-5922, ¶ 11 (17-day delay); *State ex rel. Landis v. Morrow Cty. Bd. of Elections*, 2000-Ohio-295, ¶ 8-9 (22-day delay); *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections*, 1995-Ohio-269, ¶ 13 (17-day delay).

{¶ 24} Relators argue that their delay was not unreasonable because the secretary issued a second directive on September 17 and an advisory on September 20. But neither the second directive nor the advisory substantially altered Directive 2024-21. The second directive informed county boards of elections about the district court's injunction in *League of Women Voters of Ohio*, 2024 WL 3495332, and referred the boards of elections to Directive 2024-21 regarding procedures for the return of absentee ballots. The advisory says that boards of elections may choose to operate a drive-through ballot drop-off system during periods of high-volume turnout. This system, however, is optional and, if anything, would make it easier for persons to return absentee ballots, not harder. The second directive and the advisory did not cause relators' claimed injury; the first directive did. And the Ohio Democratic Party was aware of that injury shortly after August 31.

{¶ 25} The individual relators—Duffy and Wernet—also argue that they were not aware of their specific injuries until shortly before they filed the complaint because their circumstances have recently changed. This argument is not supported by their affidavits. Wernet avers that his wife has early-stage dementia but not that her condition got markedly worse after the secretary issued Directive 2024-21. Duffy avers that he was released from the hospital the day before he filed the complaint, but he also avers that he has recently been in and out of the hospital. Duffy could have reasonably foreseen that his hospital stays might have prevented him from voting in person. Moreover, we will not change our laches analysis based on one voter's recent changed circumstances. Individual electors generally have standing to bring mandamus actions to enforce the election duties of public officers, *see State ex rel. Holwadel v. Hamilton Cty. Bd. of Elections*, 2015-Ohio-5306, ¶ 41, but any one voter's personal circumstances could change at any time before election

day. Allowing one voter to seek statewide relief in a mandamus action based on the voter's own changed circumstances, no matter how close the election and whatever the resulting prejudice, would effectively eliminate laches as a defense in voting-related cases.

{¶ 26} The secretary has also shown material prejudice. The attestation and drop-box requirements in Directive 2024-21 have already been printed and mailed to voters as part of the instructions included with absentee ballots. Chris Burnett, the Deputy Assistant Secretary of State and State Elections Director, avers that if a voter requests an absentee ballot, the appropriate board of elections mails a ballot to the voter along with instructions, a preprinted return mailing envelope, and an identification envelope. The requirements in Directive 2024-21 for the return of an absentee ballot are included on the instructional sheet that is mailed with the absentee ballot. Overseas and absent military voters, who started voting on September 21, *see* R.C. 3509.01(B)(1), have already been sent these instructions. Regular absentee balloting began on October 8—the first day after the close of voter registration before the election, *see* R.C. 3509.01(B)(2)—and the instructions for these ballots are either currently being mailed or already have been. Burnett avers that it will take at least three to five days for boards of elections to print new instructions and include them with an absentee ballot that has not already been mailed—at a time when board employees have numerous other duties.

{¶ 27} Prejudice occurs in election cases involving requested changes to absentee ballots if a relator's delay in filing leads to the impossibility of relief before the ballots are printed and mailed. *See Syx*, 2020-Ohio-4393, at ¶ 16; *State ex rel. Carberry v. Ashtabula*, 2001-Ohio-1625, ¶ 11 (lead opinion); *Polo*, 1995-Ohio-269, at ¶ 13. Here, the absentee ballots themselves would not have to be reprinted, but the instructions included with the ballots would have to be reprinted and in some cases mailed separately. The secretary and county boards of elections would be prejudiced by the cost and time of printing and mailing new instructions.

Relators argue that the writ need not require that the boards of elections send out new instructions. Rather, relators contend that an absent voter's assistant could deliver the voter's absentee ballot to a drop box even if the voter had obtained incorrect instructions. But we will not endorse a scenario in which boards of elections send voters incorrect instructions and unavoidably create voter confusion.

**{¶ 28}** Furthermore, absentee voting has already begun. As a general matter, courts should refrain from ordering changes to the rules governing elections during or close to the start of an election. *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). Such court orders may themselves result in voter confusion. *Id.* "Even seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences." *Democratic Natl. Commt. v. Wisconsin State Legislature*, 141 S.Ct. 28, 31 (2020) (Kavanaugh, J., concurring); *see also State ex rel. DeMora v. LaRose*, 2022-Ohio-2173, ¶ 71-72 (Kennedy, J., concurring in part and dissenting in part); *id.* at ¶ 95-98 (Fischer, J., concurring in part and dissenting in part). Though *Purcell* is a federal case and therefore not binding on this court, we find its logic persuasive.

**{¶ 29}** While primarily built on principles of federalism, *Purcell* also stands "for the common-sense principle that judges—novices in election administration—should not meddle in elections at the last minute . . . because when they do, they are likely to do more harm than good." *DeMora* at ¶ 130 (DeWine, J., concurring in part and dissenting in part); *see also Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so."); *DeVisser v. Secy. of State*, 510 Mich. 994, 1000 (2022) (Welch, J., concurring) ("[The *Purcell* principle] is, in essence, the equitable doctrine of laches applied in a unique way to election matters."). At this juncture, we should "neither impose nor countenance substantial alterations to existing . . . procedures during the pendency of an ongoing election." *New PA Project Edn. Fund v. Schmidt*, __ Pa. __,

__, 2024 WL 4410884, *1 (Oct. 5, 2024). And although *Purcell* precluded injunctive relief in a federal case, *Purcell* at 5-6, the rationale set forth in *Purcell* applies to relief in mandamus actions as well. Both are extraordinary remedies that direct the conduct of a party. *Nken v. Holder*, 556 U.S. 418, 428 (2009) (injunction); *State ex rel. Ferrara v. Trumbull Cty. Bd. of Elections*, 2021-Ohio-3156, ¶ 7 (mandamus); *see also DeMora* at ¶ 131 (DeWine, J., concurring in part and dissenting in part).

**{¶ 30}** Thus, in situations in which a litigant has not timely asserted its rights in a case that asks for changes in election procedures so close to the election that the case cannot be resolved before voting begins, the rationale set forth in *Purcell* necessarily informs our consideration of the prejudice requirement of laches. Here, if we were to grant a writ, we would effectively be ordering a change to election procedures after the election has already started. Intrusions into elections that would lead to disparate enforcement of election procedures and confusion among voters should be avoided. *See State ex rel. Skaggs v. Brunner*, 2008-Ohio-6333, ¶ 58 ("By changing her instructions for one county but not for others after the election at the request of a candidate, the secretary of state failed to ensure that the same rules would be applied to each provisional voter of every county in the state.").

**{¶ 31}** Finally, for laches to apply, the prejudice must have been avoidable if the relators in a case had filed their case promptly. *See State ex rel. Miller v. Union Cty. Bd. of Elections*, 2023-Ohio-3664, ¶ 20; *see also State ex rel. Brinda v. Lorain Cty. Bd. of Elections*, 2007-Ohio-5228, ¶ 13. Here, much of the prejudice to the secretary and boards of elections could have been avoided if relators had filed their complaint shortly after the secretary issued Directive 2024-21. Because the case relates to an election within 90 days, the briefing schedule for the case was automatically expedited under S.Ct.Prac.R. 12.08. We sua sponte *further* expedited the schedule, 2024-Ohio-4746, with briefing completed ten days after the case was filed—as quick as reasonably possible for such an involved case, particularly given

that relators filed their complaint late in the afternoon on a Friday. Military and overseas balloting began on September 21, but regular absentee balloting did not begin until October 8, and had relators filed their complaint shortly after the secretary issued Directive 2024-21, we likely could have issued a decision by October 8. By waiting until September 27 to file their complaint, relators made meeting such a deadline impossible.

**{¶ 32}** Our "consistent requirement that expedited election cases be filed with the required promptness is not simply a technical nicety." *Carberry* at ¶ 11 (lead opinion). Because of relators' delay in filing their complaint, if we were to grant a writ, the secretary and county boards of elections would incur significant prejudice and our order would change the procedures of an election that has already begun. Therefore, we conclude that laches bars relators' claims and deny the writ based on laches.

**{¶ 33}** Because we deny the writ based on laches, we do not address the merits of relators' claims. *See Fuller*, 2002-Ohio-5922, at ¶ 12.

### III.  CONCLUSION

**{¶ 34}** Relators' claims are barred by laches. We therefore deny the writ and do not reach the merits of their claims. In addition, we deny the motion to intervene filed by the Republican National Committee and the Ohio Republican Party, but we sua sponte convert their merit brief to an amici curiae brief.

Writ denied.

—————————————

**BERGERON, J., joined by HOFFMAN, J., dissenting.**

**{¶ 35}** I join the second dissenting opinion in full, writing separately only to elaborate on the statutory-interpretation question avoided by the majority and to shine a spotlight on what is really happening here—a sleight of hand that should make our citizens shudder. Respondent, Secretary of State Frank LaRose, has dismantled a structure crafted by the General Assembly and imposed illegal barriers

on the right to vote of some of our most vulnerable citizens. I respectfully dissent, and I would grant the writ of mandamus and require the secretary of state to protect—rather than undermine—the fundamental right to vote.

{¶ 36} The secretary's directive at issue here, Directive 2024-21, cruelly targets persons who must, by necessity, rely on the help and grace of others. Disabled or elderly, they often cannot accomplish basic tasks without assistance. I have personal experience with this, having lived through both of my parents' losing battles with progressive cognitive diseases. Fortunately for them, they were cared for in an assisted-living facility, where they received food and medical oversight. But for basically everything else, I had to step up and help them, while also juggling the demands of my own children and a full-time job. The stress and challenges that were imposed on me are difficult to overstate, as I'm sure caretakers across this State can attest. Because of my job, I often had to provide my assistance after normal business hours, which meant running errands, scheduling doctor's appointments, paying their bills, etcetera, at late hours of the night.

{¶ 37} So I understand, at a deep level, how pernicious Directive 2024-21 is, and we might as well call it what it is—an affront to personal dignity. The directive adds one more unnecessary challenge to overtaxed caregivers, encouraging them to throw up their hands and say, "I don't have time for this." Voting will get triaged to the bottom of the never-ending to-do list, and, by design, this directive will convince many people not to vote. That is a travesty beyond description.

{¶ 38} I endorse the second dissenting opinion's discussions of laches and the mandamus standard and adopt them here. With that backdrop, I turn to the relevant statutory language, which really should be the beginning and the end of the inquiry. *See State ex rel. Stokes v. Brunner*, 2008-Ohio-5392, ¶ 29, quoting *State ex rel. Myles v. Brunner*, 2008-Ohio-5097, ¶ 26 ("Therefore, 'we need not defer to the secretary of state's interpretation because it is unreasonable and fails to

14

apply the plain language' of [the statutes at issue]."); *TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 3 (explaining that "the judicial branch is *never* required to defer to an agency's interpretation of the law" and that "an agency interpretation is simply one consideration a court *may* sometimes take into account" [emphasis in original]). R.C. 3509.05 sets forth a comprehensive statutory scheme for the procedures involving absentee ballots and the appropriate ways to return those ballots. Consistent with that framework, upon receipt of an absentee ballot, the voter must complete "the statement of voter" by providing personal identifying information on the outside of the identification envelope and signing that statement under penalty of election falsification. R.C. 3509.05(A) and (B). This ensures that only an authorized person is voting.

{¶ 39} Turning to division (C), the voter may mail his or her absentee ballot to the office of the county board of elections or, if the board of elections has placed at its office a "secure receptacle . . . open to receive ballots," colloquially known as a "drop box," then the voter may deliver his or her ballot to the drop box. R.C. 3509.05(C)(1) and (3)(a) and (b). But division (C) goes far beyond just allowing the board of elections to place a drop box at its office—the entire process is heavily regulated. First, the board of elections may have only a single drop box. R.C. 3509.05(C)(3)(a) (restricting the board of elections to "plac[ing] not more than one secure receptacle outside the office of the board . . . for the purpose of receiving absent voter's [sic] ballots"). Second, division (C) requires that such a drop box must be monitored by recorded video surveillance at all times (with provisions for making the recordings public). R.C. 3509.05(C)(3)(c). Finally, and most importantly for present purposes, the General Assembly determined that if the board of elections chooses to install a drop box outside its office, the drop box "*shall* be open to receive ballots at *all times* during that period." (Emphasis added.) R.C. 3509.05(C)(3)(b). The term "that period" refers to "the period beginning on

the first day after the close of voter registration before the election and ending at seven-thirty p.m. on the day of the election." *Id.* Therefore, the drop box must be open to receive absentee ballots at all times during the early-voting window through 7:30 p.m. on election day.

{¶ 40} The provisions contained in R.C. 3509.05 ensure that drop boxes are limited in number and that each drop box is secure, open at all times, and monitored by recorded video surveillance. But the General Assembly did not stop there. In December 2022, it saw fit to amend R.C. 3599.21 in order to impose *criminal* penalties (in the nature of a fourth-degree felony) on anyone, other than an authorized person as defined in R.C. 3509.05(C)(1) or employees or contractors of the postal service or a private carrier, who returns another person's absentee ballot. 2022 Sub.H.B. No. 458 (amending R.C. 3599.21(A)(9)).[1] Therefore, our State imposes criminal penalties on an unauthorized person who returns another's legitimate absentee ballot, a pretty draconian measure.

{¶ 41} Secretary LaRose apparently deemed those measures insufficient to combat the fantom harm of "ballot harvesting," and thus he sought to erect additional barriers by issuing Directive 2024-21. As this court has explained, the secretary, through the vehicle of a directive, cannot supplant or modify statutory language passed by the General Assembly; otherwise, that transforms him into a legislative actor with nearly unfettered power. *See State ex rel. DeMora v. LaRose*, 2022-Ohio-2173, ¶ 35, 37 (holding that "if the statutory language is clear and unambiguous, a court will apply the statute as written and will not add or delete words" and granting a writ of mandamus regarding a directive issued by the secretary because the secretary "offered no compelling reason to disregard the

---

1. A federal court found these provisions were preempted by the federal Voting Rights Act as applied to a disabled voter's ability to choose an assistant to assist with voting, so there is an additional group of people authorized to return absentee ballots by virtue of the federal court's order. *See League of Women Voters of Ohio v. LaRose*, 2024 WL 3495332, *20 (N.D.Ohio July 22, 2024).

statutory language" in response to challenges to the directive); *see also State ex rel. Tjaden v. Geauga Cty. Bd. of Elections*, 2024-Ohio-3396, ¶ 39, quoting *State ex rel. Whitehead v. Sandusky Cty. Bd. of Commrs.*, 2012-Ohio-4837, ¶ 30 (refusing to read a provision into a statutory requirement because "'courts are forbidden to add a nonexistent provision to the plain language of legislation' " [bracketed text omitted]); *In re Election of Member of Rock Hill Local School Dist. Bd. of Edn.*, 1996-Ohio-356, ¶ 18 (finding that the board of elections' interpretation of R.C. 3509.05 was contrary to law).

{¶ 42} But that is exactly what the secretary has done, seizing the legislative reins, and we need look no further than the language of Directive 2024-21 to appreciate his maneuvering. The secretary, purporting to "act[] under [his] statutory authority to compel the observance of election laws," decided to erect new and extrastatutory hurdles on people seeking to deliver legitimate absentee ballots, declaring in the directive "that only a voter's personal ballot may be returned via drop box."

{¶ 43} Any person, it seems, may deliver an absentee ballot to a drop box—except those aiding our most vulnerable citizens. These assisting family members or good Samaritans must come to the office of the county board of elections during its business hours and complete an attestation form, under penalty of election falsification, attesting that the person is (1) "returning a ballot on behalf of a family member under R.C. 3509.05(C)(1) [and has] been lawfully designated to assist another voter with the return of an absentee ballot" or (2) complying with the Voting Rights Act if the person is assisting a disabled voter. This is little more than voter intimidation, the latest chapter in an unfortunate history of efforts to suppress certain categories of voters.

{¶ 44} It's not too difficult to see why the directive violates the plain language of Ohio's statutes. After all, the General Assembly decreed that a drop box "*shall* be open to receive ballots at *all times*" during the relevant voting period.

(Emphasis added.) R.C. 3509.05(C)(3)(b). The secretary seems to insist that this language does not actually mean that a drop box "shall receive ballots." Why would a drop box be open if not to receive ballots? For decoration? As a prop? There is only one statutory (or common sense) purpose of a drop box, and in case we were confused about that, the General Assembly laid any doubt to rest: the drop box exists "for the purpose of receiving absent voter's (sic) ballots under this section," R.C. 3509.05(C)(3)(a). Through his directive, the secretary decimates the entire statutory purpose of a drop box.

{¶ 45} The secretary fashions two other arguments in seeking to persuade us of the legitimacy of Directive 2024-21. First, he insists that the directive was necessary to comply with the federal court's order in *League of Women Voters of Ohio v. LaRose*, 2024 WL 3495332 (N.D.Ohio July 22, 2024). This is a curious justification indeed. In that case, a federal court concluded that certain Ohio statutory provisions limiting whom a disabled voter may select to assist in returning the voter's absentee ballot were preempted by the federal Voting Rights Act. *Id.* at *22. It strains credulity to point to a decision ensuring and promoting voting rights as a justification to suppress the franchise.

{¶ 46} Second, the secretary maintains that because a county board of elections is not mandated to install a drop box at all, he enjoys relative free reign to regulate in this area. But this argument proves too much. The secretary is correct that a board of elections does not have to provide a drop box, *see* R.C. 3509.05(C)(3)(a), *but* if it does, the General Assembly has imposed a litany of rules that govern its use. This is really no different than any governmental program or option that, although not required, is heavily regulated if the government opts in favor of it. The discretionary nature of a drop box does not grant the secretary license to dismantle the protections and directions established by the General Assembly. After all, the relief that relators seek, if granted, would apply only to

18

boards of elections that have provided a drop box, thus negating much of the relevance of the secretary's retort.

{¶ 47} The secretary's arguments seek to shift the target because he has little else to say about the plain language of the statute, a telling point. The statute does not limit what person may use a drop box. *See* R.C. 3509.05(C)(1). It does not impose various conditions and qualifications on a voter seeking to use a drop box—and why would it? The entire purpose of the drop box is to make it *easier* for people to vote. Rather than stand in line during normal poll hours, voters may deliver their absentee ballots at *their* convenience.

{¶ 48} As in *DeMora*, 2022-Ohio-2173, at ¶ 35, 37, the secretary here is violating statutory law by imposing conditions on voters that the legislature could have considered.[2] "Had the General Assembly intended to impose an obligation on an absentee voter . . . it certainly knew how to do so, *i.e.*, the term . . . could easily have been inserted in R.C. 3509.05." (Emphasis in original.) *Election of Member of Rock Hill Local School Dist. Bd. of Edn.*, 1996-Ohio-356, at ¶ 16. The General Assembly has shown no hesitation in enacting provisions that it believes are necessary to combat potential voter fraud, as evidenced by the recent criminal-penalty provision discussed above. *See* R.C. 3599.21(A)(9). If the General Assembly wished to require returners of absentee ballots to sign an attestation form or jump through other hoops, it would have delineated those measures in the appropriate statute. But it did not. Consistent with our longstanding duty to "'liberally construe election laws in favor of the right to vote,'" *State ex rel. Skaggs v. Brunner*, 2008-Ohio-6333, ¶ 50, quoting *State ex rel. Colvin v. Brunner*, 2008-Ohio-5041, ¶ 62, *abrogated on other grounds by TWISM Ents.*, 2022-Ohio-4677,

---

2. I appreciate that relators have raised certain constitutional and federal statutory arguments. Given the clarity of R.C. 3509.05, I need go no further to tackle those issues, and I would leave them for another day.

at ¶ 26, 42-43, the clarity of the statutory language highlights the brazenness of the secretary's efforts.

{¶ 49} The secretary's directive both silences the voice of the people's representatives in the General Assembly by amending statutes without the power to do so and targets an incredibly vulnerable population, rendering it much more difficult for such voters to vote. And this effort is really a solution in search of a problem that doesn't exist. In May 2024, the State conducted the primary election without the instructions set forth in Directive 2024-21. Yet nothing untoward happened. In addition to violating the plain language of the governing statutes, Secretary LaRose has failed to show in any meaningful way how allowing an already authorized person to deliver a loved one's absentee ballot to a drop box would in any way interfere with the election process. This is discrimination, pure and simple.

{¶ 50} I wish we could dismiss Directive 2024-21 as just another attention-grabbing measure hollow of substance. But I know that real voters will be concretely affected by it, just like relators Norman Wernet and Eric Duffy, along with countless others. Our government, and particularly our courts, should ensure the protection of the most vulnerable members of our population—those without money, power, or political might. The directive issued by Secretary LaRose, and the decision by the majority allowing it to persist, sends the message that marginalized citizens may be safely relegated to the sidelines in our democracy.

_____

**BRUNNER, J., joined by BERGERON and HOFFMAN, JJ., dissenting.**

**I. INTRODUCTION**

{¶ 51} On August 31, 2024, respondent, Secretary of State Frank LaRose, violated the election laws of Ohio by issuing Directive 2024-21, impermissibly imposing additional burdens on certain distinct classes of Ohio voters who vote by absentee ballot. Ohio law provides that any absentee voter may have a near relative

20

(with the degree of relation specified in the law) deliver the voter's absentee ballot in person to a county board of elections in lieu of delivery by mail. R.C. 3509.05(C)(1). More broadly, federal law provides that any voter with a disability may be given assistance to vote by almost any person of the voter's choice. 52 U.S.C. 10508. Boards of elections in Ohio are permitted to supply a "secure receptable," known as a drop box, outside the office of the board of elections for absentee ballots to be delivered to at all times during the period designated for early voting through 7:30 p.m. on election day. *See* R.C. 3509.05(C)(3)(a) and (b). Directive 2024-21 instructs boards of elections that "the only individual who may use a drop box to return the ballot is the voter" and that a person delivering an absentee ballot for a family member or disabled voter must return the ballot to a board of elections official at the board of elections' office and, while doing so, complete an attestation form. In addition, the directive requires each board of elections to place this warning sign (or one with substantially similar language) at or on a drop box:



Ohio Secretary of State, *Drop Box Protocol Sign*, https://www.ohiosos.gov /globalassets/elections/eoresources/pol-loc-resources/dropboxprotocol_2024-08_legalsize_v2.pdf (accessed Oct. 12, 2024) [https://perma.cc/3FBY-PM69]. Despite the secretary's holding no prosecutorial powers, the sign misleadingly features an Ohio flag shaped into a shield—much like a police badge encased in a circle—to represent the secretary's Public Integrity Division and is accompanied by prosecutorial and threatening language, such as:

> Ohio law prohibits the unauthorized return of a ballot on behalf of another voter. Anyone charged with this offense could be charged with a fourth degree felony, punishable by up to 18 months in prison and/or a fine of up to $5,000.

The sign also provides:

> If you are assisting another voter with the return of a ballot, you MUST see a board of elections official who can provide you with the necessary attestation form.

(Capitalization in original.) Finally, a potential drop-box user is warned that the "secure drop box is monitored under 24/7 video surveillance."

{¶ 52} Relator the Ohio Democratic Party ("ODP") and relators Norman Wernet and Eric Duffy—two citizens directly aggrieved by the secretary's directive—have sought relief from this court in mandamus. In response, the secretary claims that it is too late in the election cycle to rescind the directive without reprinting absentee instructions and causing chaos. The chaos in this unfortunate situation arises from the secretary's lack of statutory authority to have issued Directive 2024-21 in the first place and his subsequent modification of the

instructions in the directive two more times by his issuance of a second directive and an advisory. Even more unfortunate is this court's failure to uphold the rule of law and to stop the secretary from engaging in illegal official behavior and instead applying the doctrine of laches in a laissez-faire fashion. The timing issues were in play from the beginning here as a result of the secretary's frenzied political maneuvers; he should have known better than to foist unwieldy changes on Ohio's election officials and the State's voters this close to a general election in which electors will vote for a new president.

{¶ 53} As often as politically motivated claims are made that judges should not legislate from the bench, neither should they give away their power, in this case, the power of deciding what the law is, just because the secretary has said it is too late to do that. Good judgment by this court would be to tell the secretary that he has violated his constitutional duties rather than followed them. Good judgment would be to resist the temptation to decide that there is no way to deal with the mess the secretary has created. Good judgment would be to avoid penalizing the people who have petitioned for redress of their grievances relating to the secretary's actions.

{¶ 54} Laches is not the same as mootness when it comes to elections, and laches should be applied only rarely and not when the interest sought to be protected is substantial—namely, the right to vote. When faced with the tension that is before us between the illegal actions of the secretary and the realities of the mess those actions have created, we must not throw up our hands after having been fed what amount to feeble excuses. We must mandate compliance with the law. What the secretary has done is brazen and reckless. This case's timing is an issue because his deliberate and repeated actions have created the chaos of which he complains. Now he asks that we turn away relators for allegedly sitting on their claims for too long for this court to provide them a remedy. Nothing could be further from the evidence, and nearly everything about the secretary's actions strays from justice.

When this court permits Directive 2024-21 to continue unhindered, it permits a continued assault on the fairness of Ohio's general election, torching Ohioans' voting rights all the way to election day.

{¶ 55} It is said that a court's job is to "call the balls and strikes," which are determined according to rules—in this instance, the rule of law. Laches is an equitable defense. It is to be used by one whose hands are clean to begin with. When the secretary breaks laws that govern what he can and cannot do, he vitiates his ability to use an equitable defense such as laches. When the secretary—as the principal actor—has by his overreach and lateness created the constitutional infirmity complained of, laches is no defense. In reaching its decision, the majority disavows the idea that elections belong to the people as a whole and not to just some of them—who can deliver their ballots to the boards of elections without assistance. When the protections of the law have been denied to some, with early voting already underway, fairness does not require that all must be deprived. The law requires obedience and demands remedies to preserve its efficacy and the substance of people's faith in what is merely an idea—democracy. Even though some citizens may experience the effects of government's misguided intentions and failures, a remedy at nearly any juncture before mootness means that all need not suffer those effects. Laches is inapplicable in this case.

{¶ 56} I would grant the petition for a writ of mandamus sought by relators here. Because the majority instead dismisses this action on the basis of the equitable defense of laches, I respectfully dissent.

## II. FACTS

{¶ 57} On August 31, 2024, the secretary issued Directive 2024-21, providing the following instructions regarding the delivery of absentee ballots to Ohio's 88 county boards of elections:

[T]he only individual who may use a drop box to return the ballot is the voter. All individuals who are delivering ballots for a family member or disabled voter may either mail the ballot to the county board of elections or return the ballot to a county board of elections official at the county board of elections office and complete an attestation at the board of elections.

{¶ 58} The directive requires county boards of elections to provide the person assisting a voter with an attestation form declaring that (1) the person is "returning a ballot on behalf of a family member under R.C. 3509.05(C)(1), and that [the person has] been lawfully designated to assist another voter with the return of an absentee ballot" or (2) "[i]f the person is assisting a disabled voter, that [the person is] complying with Section 208 of the Voting Rights Act and that [the person is] not the voter's employer or agent of that employer or officer or agent of the voter's union." The directive also requires that a sign be posted at or on a drop box; the template for this sign provided by the secretary informs Ohioans, in prosecutorial and threatening language, that a person assisting another voter with the return of an absentee ballot could be charged with a felony and subjected to prison time or a fine if the person uses a drop box to deliver the ballot and does not instead see a board of elections official who can provide a required attestation form. When the secretary issued the directive, it was 66 days before the date of the general election, 38 days before the start of early voting, and only 21 days before the first absentee ballots were to be mailed.

{¶ 59} On September 17, 2024, the secretary issued Directive 2024-24, directing county boards of elections, in accordance with the federal court's decision in *League of Women Voters of Ohio v. LaRose*, 2024 WL 3495332, *7-20 (N.D.Ohio July 22, 2024), to not enforce Ohio restrictions on whom a disabled voter chooses to return the voter's absentee ballot, other than that, as a matter of

federal law, such person cannot be the voter's employer or agent of that employer or officer or agent of the voter's union. Directive 2024-24 also instructs boards of elections to "see Directive 2024-21 regarding procedures for the return of an absent voter's ballot." When the secretary issued Directive 2024-24, it was 49 days before the date of the general election, 21 days before the start of early voting, and only 4 days before the first absentee ballots were to be mailed.

{¶ 60} On September 20, 2024, the secretary issued Advisory 2024-03, recommending that county boards of elections develop traffic-mitigation plans for absentee-ballot deliveries during periods of high-volume turnout and stating that if board members voted to utilize such a plan, "[t]he board must require the bipartisan team of board employees to require any person assisting another with the return of a ballot to complete Form 12-P: Absentee Ballot Delivery Attestation as required by Directive 2024-21." When the secretary issued Advisory 2024-03, it was 46 days before the date of the general election, 18 days before the start of early voting, and only 1 day before the first absentee ballots were to be mailed.

{¶ 61} Seven days later, on September 27, 2024, relators filed an original action in mandamus seeking a writ ordering the secretary to rescind Directive 2024-21 and to instruct county election officials to accept absentee ballots from voters and voters' authorized family members and assistants without the attestation, including by drop box. Wernet avers that he would like to utilize the drop box in Franklin County to deliver his wife's absentee ballot. He explains that his wife has early-stage dementia and that he is also elderly and will struggle to walk from his car to the county board of elections' office, wait in line, and execute the required attestation. Duffy avers that he is blind, has been in and out of the hospital recently, and would like to have someone deliver his absentee ballot for him but that he is unsure whether his preferred assistant could deliver his ballot—if the assistant is not permitted to use the drop box—without pain and significant exertion because the assistant has difficulty walking and standing in line for extended periods of

time. The chairwoman of ODP, on behalf of ODP, avers that many of ODP's members and constituents rely on authorized relatives or, for members and constituents with disabilities, designated assistants to deliver absentee ballots and that Directive 2024-21 will likely deter some of ODP's members and constituents from voting.

### III. ANALYSIS

### A. Standards

**{¶ 62}** In general, an administrative rule (or, in this case, directive) "may not add to or subtract from a legislative enactment. If it does, the rule clearly conflicts with the statute, and the rule is invalid." (Citation omitted.) *State ex rel. Am. Legion Post 25 v. Ohio Civ. Rights Comm.*, 2008-Ohio-1261, ¶ 14; *see also State ex rel. Painter v. Brunner*, 2011-Ohio-35, ¶ 35, 36, 52 (demonstrating the same principle regarding secretary-of-state directives). Moreover, courts do not defer to the secretary on matters of law. *See State ex rel. Hildreth v. LaRose*, 2023-Ohio-3667, ¶ 22.

**{¶ 63}** To obtain a writ of mandamus, relators must show by clear and convincing evidence (1) a clear legal right to the requested relief, (2) a clear legal duty on the part of the secretary to provide it, and (3) the lack of an adequate remedy in the ordinary course of the law. *Id.* at ¶ 10. There is no dispute that relators lack an adequate remedy in the ordinary course of the law given the proximity of the November general election. *See id.* It is also well-established in our caselaw that when considering the merits, if a directive of the secretary conflicts with election laws, a writ should issue. *State ex rel. Colvin v. Brunner*, 2008-Ohio-5041, ¶ 20, *abrogated on other grounds by TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 26, 42-43, citing *State ex rel. Melvin v. Sweeney*, 154 Ohio St. 223, 225-226 (1950).

**{¶ 64}** Thus, the simple question in this case is: Does Directive 2024-21 conflict with a statute?

**B. Ohio and Federal Law Allow a Voter's Assistant to Deliver the Voter's Absentee Ballot to an Existing Drop Box at Any Time During the Voting Period, but the Secretary's Directive Does Not**

{¶ 65} Under federal and Ohio law, in certain circumstances, a voter is permitted to have assistance with the delivery of the voter's absentee ballot. 52 U.S.C. 10508 provides: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." R.C. 3509.05(C)(1) provides that any "elector may personally deliver [the elector's absentee ballot] to the office of the board, or the spouse of the elector, the father, mother, father-in-law, mother-in-law, grandfather, grandmother, brother, or sister of the whole or half blood, or the son, daughter, adopting parent, adopted child, stepparent, stepchild, uncle, aunt, nephew, or niece of the elector may deliver it to the office of the board."

{¶ 66} Ohio law also provides that a county board of elections may choose to maintain a secure, video-monitored, ballot box to which absentee ballots may be delivered at any time during the early voting period and through 7:30 p.m. on the day of the election. R.C. 3509.05(C)(3)(a) through (d). As relevant to this case, R.C. 3509.05(C)(3) provides:

(a) The board of elections may place not more than one secure receptacle outside the office of the board, on the property on which the office of the board is located, for the purpose of receiving absent voter's [sic] ballots under this section.

(b) A secure receptacle shall be open to receive ballots only during the period beginning on the first day after the close of voter registration before the election and ending at seven-thirty p.m. on

the day of the election. The receptacle shall be open to receive

ballots at all times during that period.

{¶ 67} The upshot of the provisions quoted above is this: as a matter of federal and Ohio law, a voter may have a relative (as set out in R.C. 3509.05(C)(1)) deliver the voter's absentee ballot and a disabled voter may be given assistance to vote by "a person of the voter's choice" (other than the voter's employer or agent of that employer or officer or agent of the voter's union), which presumably includes assistance with the delivery of the disabled voter's absentee ballot, and the delivery of an absentee ballot may be to a secure ballot box (if one has been established) which "shall be open to receive ballots at all times" of the day or night starting the day after the close of voter registration and through 7:30 p.m. on election day. 52 U.S.C. 10508; R.C. 3509.05(C)(1) and (3)(a) and (b). Yet Directive 2024-21 instructs that "the only individual who may use a drop box to return the ballot is the voter. All individuals who are delivering ballots for a family member or disabled voter may either mail the ballot to the county board of elections or return the ballot to a county board of elections official at the county board of elections office and complete an attestation at the board of elections." This directive is *plainly* in conflict with Ohio's statutory scheme. Just as plainly, therefore, a writ of mandamus should issue. *See Am. Legion Post 25*, 2008-Ohio-1261, at ¶ 14, 23; *Hildreth*, 2023-Ohio-3667, at ¶ 10, 23; *Colvin*, 2008-Ohio-5041, at ¶ 20. Yet despite this analysis of the merits showing that relators are entitled to the writ and even though the secretary took action to violate the law shortly before an election, the majority declines to issue a writ because it holds that relators waited too long to file their mandamus complaint. I disagree with the majority's decision.

### C. Laches

{¶ 68} "Laches may bar an action for relief in an election-related matter if the persons seeking this relief fail to act with the requisite diligence." *Smith v.*

*Scioto Cty. Bd. of Elections*, 2009-Ohio-5866, ¶ 11.  And "[w]e have consistently required [the] relators in election cases to act with the utmost diligence." *Blankenship v. Blackwell*, 2004-Ohio-5596, ¶ 19.  "The elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party."  *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections*, 1995-Ohio-269, ¶ 10.

{¶ 69} As an equitable defense, laches is unavailable to parties with unclean hands.  *See generally Kettering v. Berger*, 4 Ohio App.3d 254, 261-262 (2d Dist. 1982).  We have stated:

> Laches is an equitable doctrine and it is fundamental that he who comes into equity must come with clean hands.  A knowing violation of applicable law would certainly preclude a party from asserting the affirmative, equitable defense of laches.

(Citation omitted.)  *State ex rel. Mallory v. Pub. Emps. Retirement Bd.*, 1998-Ohio-380, ¶ 27; *see also State ex rel. Columbus Coalition for Responsive Govt. v. Blevins*, 2014-Ohio-3745, ¶ 12 (noting that a party who engages in reprehensible conduct will be considered to have unclean hands).  Here, the secretary, a State official charged with administering the State's elections, overreached and issued a directive that is contrary to Ohio's statutory scheme and that the evidence shows has the effect of disenfranchising voters.  Further, the evidence appears to show that Directive 2024-21 was issued in calculated proximity to an election in order to evade challenge.

{¶ 70} August 31, the date Directive 2024-21 was issued, was a Saturday, not a regular working day at the secretary's office.  *See* R.C. 124.18(B)(5).  The

next succeeding Monday, two days later, was a holiday, Labor Day. *See* R.C. 124.19(A).

{¶ 71} Why did the secretary issue Directive 2024-21 on a holiday weekend so close in time to an election? The secretary attempts to explain his extraordinary action as an effort to prevent "ballot harvesting." But the only evidence or incident of "ballot harvesting" that he supplies is a case in which his office and a county prosecutor's office wrongfully sought the prosecution of a nursing-home employee who dropped off absentee ballots for nursing-home residents as permitted by 52 U.S.C. 10508. That felony case was dismissed, however, after a federal court ruled that Ohio law was preempted by the federal Voting Rights Act and that the secretary and other Ohio officials could not enforce criminal consequences against persons such as nonfamily caregivers who assist disabled voters in returning those voters' ballots under 52 U.S.C. 10508, *see League of Women Voters of Ohio*, 2024 WL 3495332, at *7-20. The absence of any reasonable explanation for issuing Directive 2024-21 or for the timing of its issuance leads to the inference that the secretary issued it with intention to avoid judicial review.

{¶ 72} This bears out in that, even assuming relators exercised extraordinary diligence and managed to find out about the issue, retain counsel over a holiday weekend, and file and serve a complaint by Friday, September 6, this court's rules still would have created an untenable timeline. By rule, an answer would have been due on September 9, relators' evidence and briefing would have been due on September 12, the secretary's briefing and evidence would have been due on September 16 (as September 15 was a Sunday), and relators' reply brief would have been due on September 19. *See* S.Ct.Prac.R. 12.08(A). This timeline would have left zero days before the first absentee instructions and ballots were finalized and just one day before they were mailed for this court to review the evidence and filings, vote on the case, and draft, circulate, edit, and release a decision. One day or even several is not a sufficient amount of time to fully

adjudicate an original action such as this. Briefing in this case was completed on October 7, and our decision is only now released on October 15. There was no realistic way for this case to be filed, briefed, and decided before the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") ballots and instructions were printed on September 20 and mailed on September 21, even if relators had acted with greater haste, and it is difficult to imagine that the secretary did not know this. The secretary's own actions therefore deny him the equitable defense of laches.

{¶ 73} However, since a majority of this court proceeds on the path of granting the secretary the equitable defense of laches, it is worthwhile to examine that doctrine in this opinion. The first three elements of laches are, at least arguably, established by the secretary. The complaint was filed 27 days after Directive 2024-21 was issued. The effects of Directive 2024-21 are expressed in the directive itself and arguably little of consequence to this action was contributed by Directive 2024-24 issued on September 17 and Advisory 2024-03 issued on September 20. Thus, considering 27 days in this instance is not out of the question. Our precedent shows that we have, depending on the circumstances, found delays of a similar length to be unreasonable. *See, e.g.*, *State ex rel. Syx v. Stow City Council*, 2020-Ohio-4393, ¶ 11. Wernet and Duffy suggest that they needed time to realize their changed circumstances, the impact of Directive 2024-21 on those circumstances, and, presumably, to undertake the tasks involved in filing a complaint. Our caselaw shows little tolerance for practical explanations of this nature given the requirement of "utmost diligence." *Id.* at ¶ 11-13.

{¶ 74} However, the evidence of the fourth element—prejudice—in this case is unacceptably thin. The secretary asserts that the prejudice at issue is that new absentee ballot instructions would need to be printed and mailed. It is true that instructions would need to be reprinted given that the instructions previously printed and mailed to voters inform them that "[t]he person delivering the ballot for

a family member of disabled voter must complete an attestation form at the county board of elections office (Form 12-P). . . . Drop boxes may only be used by a voter to return their own personal ballot." However, for laches to apply, the alleged prejudice to a respondent such as the secretary must be causally avoidable. *See State ex rel. Miller v. Union Cty. Bd. of Elections*, 2023-Ohio-3664, ¶ 20-21. The evidence in this case does not support this tenet. The secretary's own evidence establishes that the UOCAVA absentee ballots and instructions were finalized on September 20 and mailed starting on September 21. Even if relators had more promptly realized their changed circumstances and filed within one week of the secretary's issuing Directive 2024-21, it is effectively impossible that the case would have been decided before the UOCAVA absentee ballots and instructions were finalized and mailed. In the electronic age, websites and written instructions are easily changed, along with the creation of media releases from the secretary's office, encouraging state and local media to assist in public dissemination of the changed information. By either legal or equitable view, laches is inappropriate and insufficient.

### D. The *Purcell* Principle

{¶ 75} In addition to laches, the majority further evades the clear merits of this case by citing what one member of the majority once referred to as "the common-sense principle that judges—novices in election administration—should not meddle in elections at the last minute." *State ex rel. DeMora v. LaRose*, 2022-Ohio-2173, ¶ 130 (DeWine, J., concurring in part and dissenting in part), citing *Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006). As Ohio's 52nd Secretary of State,[3]

---

3. Ohio Secretary of State, *Secretaries of State of the State of Ohio: 1788 - Present*, https://www.ohiosos.gov/elections/election-results-and-data/historical-election-comparisons /secretaries-of-state-of-the-state-of-ohio-1788-present/ (accessed Oct. 12, 2024) [https://perma.cc/2VDY-R6S8].

my name appears in the captions of many cases decided and cited by this court, and I well understand that *Purcell* represents the principle that when weighing a directive that would change the rules close in time to an election, a court should *consider* the fact that rule changes close in time to an election are, themselves, disruptive of voting. The United States Supreme Court in *Purcell* put it this way:

> Faced with an application to enjoin operation of voter identification procedures just weeks before an election, the Court of Appeals was required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures. Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.

*Purcell* at 4-5. Nothing in *Purcell* or its progeny states or implies that late-coming court decisions are per se improper—and for good reason: if courts were always prevented from altering the state of play late in an election cycle, the person (or party) in charge of making the election rules could create rules to disenfranchise certain voters without consequence.

## IV. CONCLUSION

{¶ 76} Ohio law provides that a voter may have a near relative (with the degree of relation specified in the law) deliver the voter's absentee ballot to a secure drop box at a county board of elections at any time of the day or night during the voting period, and federal law provides that a disabled voter may have almost any person of the voter's choice assist the voter with voting. Yet the secretary has issued a directive that instructs, contrary to plain statutory law, that "the only

individual who may use a drop box to return the ballot is the voter" and has issued a template for a sign to be posted at or on a drop box that states that a person assisting a voter "MUST"—under threat of felony charges and resulting prison time or fines—return the voter's absentee ballot to a board of elections official who will provide "the necessary attestation form." (Capitalization in original.)

{¶ 77} The secretary overreached, issuing Directive 2024-21 just three weeks before the first absentee ballots were to be finalized and mailed. This directive requires county boards of elections to post a sign at or on a drop box that provides more intimidation than information about voting. According to the secretary's own evidence, a remedy in this case would require reprinting and resending of absentee-ballot instructions, a task that left little time for implementation by virtue of his continuing procedural changes close in time to an election. From the secretary's own evidence, it seems that a correction of these changes could be similarly and quickly accomplished for more voters to have their votes recorded and counted without fear of intimidation and illegal prosecution. The secretary's issuance of Directive 2024-21 on a Saturday, when State offices were closed, during the weekend before the Labor Day holiday when State offices would continue to be closed, is highly unusual at best and suspiciously calculated to avoid judicial review at worst—a strong basis on which to hold that the secretary has unclean hands and should not be permitted to avail himself of the equitable defense of laches. And even if he were entitled to assert that defense, he cannot show prejudice in the legal sense that is necessary, because nothing the relators could have done here would have avoided the outcome of reprinting instructions *after* absentee voting had begun.

{¶ 78} Finally, although the *Purcell* principle counsels against late interference in elections by courts, the principle does not forbid a court's intervention, because courts must maintain the ability to act as a check on election officials, especially when the rights at issue involve voting. Otherwise, an election

36

official could freely and deliberately take illegal action requiring egregious corollary action such as mandating intimidating signs at drop boxes, as long as the official did so late enough in the process to trigger *Purcell* and avoid court review.

{¶ 79} By refusing to reach the merits of relators' claims, this court permits unlawful interference by a State election official with a fair election process. Whatever intentions accompanied the secretary's actions, the result is noxious and repugnant to elections that are free, fair, open, and honest.  I would grant relators' petition for a writ of mandamus, and thus, I respectfully dissent.

_____

McTigue & Colombo, L.L.C., Donald J. McTigue, and Stacey N. Hauff; and Elias Law Group, L.L.P., Ben Stafford, Jyoti Jasrasaria, and Marisa A. O'Gara, for relators.

Dave Yost, Attorney General, and Heather L. Buchanan, Michael A. Walton, Stephen P. Tabatowski, and Jonathan D. Blanton, Assistant Attorneys General, for respondent.

ACLU of Ohio Foundation, Freda J. Levenson, Amy Gilbert, and Carlen Zhang-D'Souza; and American Civil Liberties Union, Megan C. Keenan, and Sophia Lin Lakin, for amici curiae League of Women Voters of Ohio and Ohio State Conference of the NAACP, in support of relators.

Jones Day, John M. Gore, E. Stewart Crosland, Joshua S. Ha, Sarah Welch, and Jesse T. Wynn, for proposed intervenors the Republican National Committee and Ohio Republican Party.

_____